JOHN J. PYSKATY, Plaintiff-Appellant, v. JOSEPH OYAMA *et al.*,
Defendants-Appellees.

First District (1st Division) No. 1—91—4092

Opinion filed June 30, 1994.—Rehearing denied October 19, 1994.

Joseph C. Owens and Andrew J. Creighton, both of Chicago, for appellant.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, Richard G. Howser, Richard H. Lehman, and Susan Condon, of counsel), for appellee Joseph Oyama.

Clausen, Miller, Gorman, Caffrey & Witous, P.C. (James T. Ferrini, Richard G. Howser, Richard H. Lehman, and Susan Condon, of counsel), and Cassiday, Schade & Gloor (Timothy J. Ashe, Joseph A. Giannelli, and Lynn D. Dowd, of counsel), both of Chicago, for appellee Southwest Nephrology Associates, S.C.

Brian T. Henry, of Pretzel & Stouffer, Chartered, of Chicago (Robert Marc Chemers and Scott O. Reed, of counsel), for appellees Bruce Flashner and Phyllis Gerber.

JUSTICE MANNING delivered the opinion of the court:

Plaintiff, John J. Pyskaty, filed this action for medical malpractice alleging negligence in the diagnosis and treatment of a perirectal abscess against Joseph Oyama, M.D.; Maria Aguinaldo, M.D.; Medical Services, S.C., an Illinois corporation; Bruce Flashner, doing business as Flashner Medical Partnership/The Doctors Emergency Officenter; Phyllis Gerber, M.D.; and Southwest Nephrology Associates, S.C., a corporation of Illinois. Plaintiff further alleged that the delay in diagnosis of the abscess led to a spread of infection, development of a condition known as Fournier's gangrene, and resulted in loss of a large portion of his scrotal tissue. Plaintiff's cause of action against Little Company of Mary Hospital was settled prior to trial. This case was tried before a jury in the circuit court of Cook County, and at the conclusion of plaintiff's case, the trial court entered directed verdicts in favor of all defendants and against plaintiff. Plaintiff appeals.

The plaintiff raised the following issues on appeal: (1) whether the trial court erred in barring Dr. Robert Freeark from testifying that Dr. Oyama had violated the required medical standard of care and that violation caused injury to plaintiff; (2) whether the trial court erred in barring the testimony of the treating surgeon on the issues of violation of standard of care by the defendants and causation of damages to plaintiff; (3) whether the trial court erred by barring Dr. Gary Zaid's testimony that defendants' conduct caused injury to plaintiff; (4) whether the trial court erred in granting defendant Oyama's motion *in limine* barring testimony that the delay in ordering plaintiff's surgery occurred on Thanksgiving Day; (5) whether the trial court erred in barring the testimony about plaintiff's medical condition when Dr. Rosenow first saw plaintiff; (6) whether the trial court erred in barring photographs of plaintiff's injuries; (7) whether the trial court properly excluded the admission of the medical bills; (8) whether the motion to grant defendant Flashner's Medical Partnership a directed verdict should have been denied; and (9) whether the trial court erred in granting Medical Services' motion for a directed verdict.

Plaintiff, John J. Pyskaty, testified that, in November of 1984, while tracking a deer through the woods he was injured when he fell face forward onto the ground. The next day he experienced a backache which he attributed to his fall. The back pain increased so he went to see a naprapath on or about November 10 or 11, 1984. His back pain did not subside.

On November 18, 1984, plaintiff went to the Doctors Officenter, where he was treated by Dr. Eric Teplitz, who is not a defendant. Dr. Teplitz treated plaintiff for pain in the lower back and left side,

which had increased. Dr. Teplitz gave plaintiff a complete examination, which included manipulation of the back, X rays and a reflex test. Muscle relaxants and antispasmotics were prescribed. Plaintiff testified that, initially, it seemed that the pain decreased but then increased by the next day. Plaintiff testified that on November 19, 1984, he telephoned Officenter and was given a prescription for Tylenol with codeine, which decreased the pain.

On November 20, 1984, he returned to Officenter because of constipation and pain. Plaintiff experienced pain on his left buttock due to the pressure caused by sitting while driving. Defendant Dr. Phyllis Gerber treated plaintiff at Officenter. Dr. Gerber palpated his abdomen and conducted a rectal examination, which caused plaintiff excruciating pain. Plaintiff testified that this was the first time he had rectal pain. Plaintiff did not have any swelling in the rectal area nor did he have any problems urinating. Blood and urine samples were taken. Dr. Gerber advised plaintiff that the constipation was a serious problem and could require hospitalization, if not corrected. She showed X rays to plaintiff pointing out what she believed to be a kidney stone. Dr. Gerber instructed him to urinate in a coffee can to see if he passed the kidney stone. Dr. Gerber diagnosed an infection and prescribed an antibiotic, Keflex. Plaintiff's prescription for Tylenol with codeine was refilled, and he was given an appointment to return in three days.

By the next morning, November 21, 1984, plaintiff had not had a bowel movement. He was experiencing weakness, and his left buttock had swollen to twice the normal size. When he called Officenter, he was advised to discontinue taking the Keflex due to a possible allergic reaction, to apply cold compresses and to come into the office. On November 21, 1984, at about 11 p.m., he was unable to drive due to pain from sitting. He was taken by ambulance to Little Company of Mary Hospital, which was in his neighborhood. He was taken from the ambulance to the emergency room on a gurney, where defendant Dr. Maria Aguinaldo performed a rectal examination which was very painful. His vital signs were taken, a catheter was inserted to drain urine and X rays were taken. At 3 a.m., on November 22, 1984, defendant Dr. Joseph Oyama, the internist on call, was assigned as plaintiff's physician. He is a licensed, board-certified physician in internal medicine and in nephrology, which is the treatment of kidney problems.

At about 4 a.m., on November 22, 1984, plaintiff was given an intravenous solution and antibiotics. His pain subsided after taking Demerol. At approximately 12:30 p.m. to 1 p.m., on November 22, 1984, Dr. Oyama saw plaintiff for the first time. According to Dr.

Oyama, in the early morning of November 22, 1984, he received a telephone call at home from Dr. Aguinaldo in the emergency room at Little Company of Mary Hospital, to admit a patient. Dr. Aguinaldo had made the primary diagnosis as cellulitis of the buttock and urinary retention. Because of a diffuse infection and cellulitis, she called Dr. Oyama. Dr. Oyama asked Dr. Aguinaldo if this was an abscess and she said it was cellulitis. He does not recall whether Dr. Aguinaldo said she had ruled out abscess, nor does he recall the mention of a swollen buttock. Doctors Oyama and Aguinaldo agreed to admit plaintiff with a diagnosis of perirectal cellulitis and acute urinary retention. Dr. Oyama did not see plaintiff until about 12:30 or 1 p.m. on that day, at which time his examination of plaintiff showed redness of buttock, swelling, tenderness of perianal area and a mass in the right ischiorectal area. The mass indicated an abscess, and he diagnosed rectal ischial abscess. He entered an order for a surgical consult with Dr. Donohue for the following day. On November 23, 1984, Dr. Mary K. Rosenow, a surgeon in the Donohue Group, examined plaintiff at about 8 or 9 a.m. and advised that plaintiff would need surgery as soon as possible. His testicles had swollen to the size of a grapefruit and were black and blue. Surgery was scheduled that afternoon. Prior to surgery, plaintiff testified that he smelled something putrid and felt something wet while he was being taken to surgery on the gurney. He noticed a puddle of pus and blood. When he inquired, he was told the pus and blood came from his scrotum.

Plaintiff had three operations before leaving the hospital: to drain the abscess, for Fournier's gangrene and reconstructive surgery. Plaintiff testified that since surgery there has been no hair growth on "a good half" of his scrotum, he became very withdrawn, and in 1986 he started psychotherapy for sexual problems.

Prior to trial defendants filed motions *in limine* to bar Doctors Robert Freeark, Gary Zaid, Sharifi and Mary K. Rosenow from testifying as Rule 220 (134 Ill. 2d R. 220) experts. The motions *in limine* were granted as follows. Doctors Gerber and Flashner filed a motion to bar certain expert testimony against them by Dr. Rosenow. In their motion *in limine*, Gerber and Flashner sought to bar Rosenow's testimony that: (1) in her consultation report she used the term "neglected" to describe the condition of plaintiff's abscess; (2) she was "upset" that she had not been called earlier since she is of the opinion that the prior care was negligent; (3) she was "critical" of the treatment provided at the Doctors Officenter; and (4) if plaintiff had pain on November 20, 1984, the abscess was diagnosable at that time and such testimony is cumulative of the testimony already rendered by Dr. Freeark. The motion *in limine* was granted.

Also, Doctors Gerber and Flashner filed a motion *in limine* to bar Doctors Zaid and Sharifi from testifying that Dr. Gerber deviated from the standard of care in providing care to plaintiff. Doctors Zaid and Sharifi testified in their depositions that Dr. Gerber deviated from the applicable standard of care by failing to diagnose plaintiff's perirectal abscess during the examination Dr. Gerber performed on November 20, 1984. Defendants further contend in their motion *in limine* that the bases for all three experts' opinions are the same, *i.e.*, that plaintiff exhibited symptoms on November 20, 1984, which should reasonably have led Dr. Gerber to the diagnosis of a perirectal abscess. During a deposition, Dr. Freeark's expressed opinion was that Dr. Oyama deviated from the standard of care. Plaintiff's counsel had already made a commitment to utilize Dr. Freeark as an expert witness against Dr. Gerber. Therefore, Dr. Zaid and Dr. Sharifi should be barred from expressing opinions relative to the care and treatment rendered by Dr. Gerber. Defendants contended that to allow plaintiff to present all three witness on this issue would be a waste of time and would be cumulative. The motion *in limine* was granted barring Doctors Zaid and Sharifi from offering opinions as to Dr. Gerber's alleged deviation from the standard of care.

Flashner and Gerber filed a motion *in limine* to bar plaintiff from introducing photographs taken during and after plaintiff's operative procedures. Defendants contend that the pictures do not accurately depict the injury of plaintiff at the time of the injury or the current injury as a result of the defendants' alleged negligence. Defendants' motion *in limine* to bar introduction of the photographs was granted.

Dr. Oyama and Southwest Nephrology Associates, S.C., filed a motion *in limine* to bar Dr. Freeark from testifying: (1) about the standard of care applicable to Dr. Oyama; (2) any deviation from that standard of care applicable to Dr. Oyama; and (3) that injury to plaintiff proximately resulted from the care rendered by Dr. Oyama. In a separate motion *in limine* Dr. Oyama and Southwest Nephrology Associates sought to: (1) bar testimony that the alleged delay in ordering surgery occurred on Thanksgiving Day; and (2) prohibit plaintiff from calling each of his retained experts against these defendants as all of plaintiff's experts offered the exact same criticisms of the care rendered by these defendants and as such testimony by all of plaintiff's experts would merely be cumulative in nature. The trial court granted both motions *in limine*.

Plaintiff sought admission of his medical bills during the testimony of Dr. Rosenow. Counsel for Flashner and Gerber objected to the admission of the medical bills unless the witness segregated which medical bills plaintiff would have incurred without any al-

leged negligence and which bills are alleged to be the result of defendants' negligence. The trial court held that Dr. Rosenow could testify to her bills, for the surgery she performed and medical care rendered by her, but she was prohibited from testifying about medical bills unrelated to medical care she provided to plaintiff.

The first issue is whether the trial court erred in barring the testimony of Dr. Freeark that Dr. Oyama had violated the required medical standard of care and that violation caused injury to plaintiff. Plaintiff's attorney asked Dr. Freeark whether the treatment rendered by Dr. Oyama met the required standard of care in the community. Defendant Dr. Oyama objected and a side bar was held, at which time defendant's counsel argued that Dr. Freeark was being asked to render opinions previously disallowed by virtue of the court's granting of defendant's motion *in limine*. Defendant further argued that Dr. Freeark was being asked to render opinions not previously disclosed under Rule 220. Illinois Supreme Court Rule 220(d), scope of testimony, provides:

"To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through interrogatories, depositions or requests to produce, his direct testimony at trial may not be inconsistent with nor go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings. However, he shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." 134 Ill. 2d R. 220(d).

The admission of evidence rests within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. (*Swaw v. Klompien* (1988), 168 Ill. App. 3d 705, 715, 522 N.E.2d 1267, citing *Moore v. Farmers Insurance Exchange* (1982), 111 Ill. App. 3d 401, 411, 444 N.E.2d 220.) Supreme Court Rule 220(d) safeguards against an expert witness testifying during direct examination in a manner inconsistent with the facts known or the opinions disclosed during discovery. (134 Ill. 2d R. 220(d); *Lee v. Ingalls Memorial Hospital* (1992), 238 Ill. App. 3d 154, 160 N.E.2d 160.) In order for an expert medical witness to render an opinion on the proper standards of diagnosis, care and treatment, the party offering the expert must affirmatively establish the expert's qualifications and competence to testify. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867.) An expert's opinion is allowed on the basis of his knowledge or experience which may aid the trier of fact. (*Rock v. Pickleman* (1991), 214 Ill. App. 3d 368, 547 N.E.2d 682.) Dr. Freeark's qualifications and experience established that he was qualified to

testify as an expert with respect to the standard of care in the community in reference to treatment of abscess.

Defendant argued that Dr. Freeark was barred from giving an opinion on standard of care because that would contradict his opinion given at the deposition. Defendant points to Dr. Freeark's deposition statement in reference to plaintiff's gangrene as follows:

"Q. Due to the lack of adequate data you are unable to reach an opinion as to whether additional debridement of the scrotum was caused by the delay in the surgery from the 22nd to the 23rd?

A. That's correct."

Plaintiff argues that Dr. Freeark made the following statements at his deposition which were consistent with the issue that was before the court:

"Prompt treatment would have prevented gangrene and the surgery related to that. Oyama deviated from the standard of care by not requesting surgical consult more promptly than the following day. There was only one treatment and that is drainage. Surgical consults shouldn't have been set for the next day. Once an abscess is recognized there should be immediate surgical consult. To a reasonable degree of medical certainty every hour increases the chance that the abscess will progress to serious complication."

Plaintiff's counsel read the following questions and answers from the deposition transcript:

"Q. With any perirectal infection or abscess the sooner surgical intervention is undertaken, the better as a general rule of thumb?

A. Correct.

Q. Are you able to testify to a reasonable degree of medical certainty, Dr. Freeark, as to whether any additional damage resulted to the patient as a result of a 17 to 18 hour delay in being seen by the surgeon from the time that the patient was seen by Dr. Oyama?

A. Yes, I think that every hour of delay increases the chance that the abscess will progress to the point of serious complications, and that a delay of 17 hours in instituting appropriate treatment for it is indeed a factor in this man's infection, and that this constitutes a reasonable degree of medical certainty the cause, a contributing cause to the development of Fournier's gangrene."

At the conclusion of the argument, the trial court sustained the defendant's objection to Dr. Freeark giving his opinion that Dr. Oyama departed from the required standard of care in his treatment of plaintiff, acknowledging that he had so previously ruled on the motion *in limine*. In sustaining defendant's objection the trial court reasoned that "deviations" from the standard of care "must be tied

into a causal connection" and "here he has the opinion contrary to what you are trying to have him say." The trial court granted plaintiff's motion to make an offer of proof, and plaintiff made an offer of proof as follows:

"Q. Dr. Freeark, after your review of the records from Dr. Oyama's examination at 1 p.m. on November 22, 1984 and the review of his doctor orders entered at that time, do you have an opinion based upon a reasonable degree of medical certainty as to whether or not Dr. Oyama met the standard of care of a reasonably well qualified physician in the treatment of the patient at that time?

A. I do not think he did.

Q. All right. And what is the basis of your opinion?

A. He ordered an incision and drainage of the abscess the following day.

Q. Okay. Now, let me ask another question, Doctor. Do you have an opinion based upon a reasonable degree of medical certainty as to whether or not that deviation of the standard of care by Dr. Oyama caused damage to the plaintiff?

A. I have an opinion, and I think it did cause damage.

Q. Okay. Let me ask you another question. Can you tell us what damage was caused by the deviations of the standard of care by Dr. Oyama?

A. Any delay in the drainage of an abscess that has the dimensions and the side effects of this one is going to lead to serious destructions of tissue. That damage is increasing on a moment to moment basis. I think the gangrene of the skin that developed in this patient, the loss of the scrotal skin, the destruction of the areas was a direct result of the infection extending out into the skin and interfering with its blood supply to the point where the tissue dies. That is a progressive process that can only be interrupted by prompt drainage of the underlying cause.

Q. All right. Doctor, if the defendant Oyama had treated this patient without violating the standard of care in your opinion based upon a reasonable degree of medical certainty would this patient's outcome have been different?

A. Yes, I think the sooner the drainage was done, the less would be the tissue destruction. I can't tell you to what extent it would be the scrotum, but I think —."

■ Dr. Freeark's testimony about gangrene was taken out of context, by the trial court. Dr. Freeark's statement about gangrene specifically addresses plaintiff's gangrene and not the draining of the abscess. That statement does not contradict Dr. Freeark's previous testimony about whether the treatment rendered by Dr. Oyama met the required standard of care in the community, in reference to the

abscess. Furthermore, a complete reading of Dr. Freeark's testimony shows that he unequivocally questioned the standard of care rendered by Dr. Oyama. Dr. Freeark explicitly stated, in his deposition as well as his testimony at the hearing on plaintiff's offer of proof, that he opined to a reasonable degree of medical certainty that Dr. Oyama deviated from the standard of care for treatment of an abscess and that deviation was a contributing cause of plaintiff's damage. Dr. Freeark opined that, "Yes, I think that every hour of delay increases the chance that the abscess will progress to the point of serious complications, and that a delay of 17 hours in instituting appropriate treatment for it is indeed a factor in this man's infection, and that this constitutes a reasonable degree of medical certainty the cause, a contributing cause to the development of Fournier's gangrene." According to Dr. Freeark's deposition, he opined that Dr. Oyama should have ordered that surgical consultation within six hours rather than within the 18 hours as ordered. Thus, Dr. Freeark's testimony was not contrary to giving his opinion that Dr. Oyama departed from the required standard of care in his treatment of plaintiff, and there was no inconsistency in violation of Rule 220(d).

The trial court also barred Dr. Freeark's testimony as to defendants Doctors Gerber and Aguinaldo. Plaintiff's counsel questioned Dr. Freeark as to what damage was caused by the delay attributable to the conduct of defendant Dr. Gerber. This question was objected to by counsel for Dr. Gerber on the basis that the witness could not quantify the amount of separate damage caused by each defendant. Counsel for Dr. Aguinaldo joined in the same objection and the court also sustained that objection. In sustaining the objection the trial court reasoned, "If it's a different opinion that he gave in this deposition as to any doctor, and this definitely is, and I am going to sustain the objection." The witness was called for a further offer of proof and testified as follows:

"Q. Dr. Freeark, do you have an opinion after review of the records as previously set forth based upon a reasonable degree of medical certainty as to whether or not the deviations from the standard of care of the defendant Officenter doctor caused damage to the plaintiff?

A. I do. I believe it caused damage, yes.

Q. And can you tell us what damage in your opinion was caused?

A. I believe the abscess was allowed to increase in size, destroy tissues, ultimately led to the destruction of the skin of the scrotum, perineum and penis.

Q. Okay.

A. Due to a delay in diagnosis and treatment.

Q. Okay. Doctor, if the defendant Officenter doctor had treated the patient without violating the standard of care, in your opinion based upon a reasonable degree of medical certainty would this patient's outcome have been different?

A. Yes.

Q. And what is your opinion, doctor?

A. My opinion is it would have been different. It would have been far less destruction of tissue.

Q. Okay. If the defendant Officenter doctor had treated the patient without violating the standard of care in your opinion based upon a reasonable degree of medical certainty would the development of the Fournier's gangrene have been less likely?

A. Yes, indeed.

Q. And why?

A. Because Fournier's gangrene is a terminal event in this process, and it means that the process has been going on untreated for an extensive period of time. And that process leads to the destruction of the tissues involved, and that leads to the reconstructive surgery that this patient subsequently had to undergo.

Q. Do you have an opinion based upon a reasonable degree of medical certainty if the defendant Officenter doctor had treated this patient within the standard of care as to whether or not the scrotal tissue would have been lost?

A. I think if it would have been treated promptly, there would have been no loss of scrotal tissue."

Plaintiff submits that when the trial court entered its order barring Dr. Freeark from testifying as to the damage caused by Doctors Gerber and Aguinaldo, it erred and rejected or disregarded the basic principles of tort law which apply to multiple defendants whose conduct, separately and not in concert or agreement with each other, causes the same indivisible injury of the plaintiff. In such a case, they all are jointly liable for the damages sustained by the plaintiff as a result of such injury. Where defendants share no common purpose or duty and fail to act in concert, nevertheless acting concurrently to produce an indivisible injury to the plaintiff, courts must find them to be joint tortfeasors. (*Burke v. 12 Rothschild's Liquor Mart, Inc.* (1991), 148 Ill. 2d 429, 438, 593 N.E.2d 522, 526.) In *Burke* the court held that the plaintiff's quadriplegia was due to an initial injury caused by one defendant's negligence and that was exacerbated and/or that he received an additional injury through subsequent mishandling by the other defendant's employees.

■ Even though Dr. Freeark was unwilling, or even unable, to express an opinion as to the extent of the resulting increase in damage to plaintiff's scrotum area that was attributable to the delay

of Dr. Oyama in calling for a surgery consultation and, thereby, the surgery to drain the anorectal abscess, this did not impair his testimony that the delay in diagnosis was causally related to the plaintiff's injury. Illinois Pattern Jury Instructions, Civil, No. 15.01 (3d ed. 1989) defines "proximate cause" as follows:

"15.01 Proximate Cause-Definition

When I use the expression 'proximate cause,' I mean [that] [a] [any] cause which, in natural or probable sequence, produced the injury complained of. [It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.]"

The trial court should have denied the motion *in limine* of Doctors Oyama, Gerber and Aguinaldo because of the potential joint liability of all defendants as to the proximate cause of plaintiff's injury and relegated them to their remedies against each other under the Contribution Act (Ill. Rev. Stat. 1991, ch. 70, par. 301 *et seq.*). Thus, the trial court's decision to grant the motions *in limine* of the defendants shall be reversed, the directed verdict and judgment in favor of the defendants shall be reversed and the case shall be remanded to the lower court for trial.

The second issue is whether the trial court erred in barring the testimony of the treating surgeon on the issues of violation of standard of care by the defendants and causation of damages to plaintiff. The trial court granted defendants' motion *in limine* barring the testimony of Mary K. Rosenow, treating physician, from testifying as to the standard of care and proximate cause of damage. Also, the trial court granted defendants' motion *in limine* barring Dr. Rosenow's testimony about the standard of care rendered by Dr. Oyama reasoning that her testimony was cumulative with Dr. Freeark's testimony.

By the time of the deposition, plaintiff's attorney discovered that Dr. Rosenow held opinions which found fault with the defendants' medical treatment of plaintiff. Thereafter, plaintiff's counsel wrote a letter to all defense counsel stating that Dr. Rosenow would be used by plaintiff as an expert witness. No defense counsel filed any subsequent discovery or attempted to further depose Dr. Rosenow.

In September 1988, the Illinois Supreme Court declared that treating physicians are not expert witnesses for purposes of Rule 220. (*Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525.) The following year, the Illinois Supreme Court ruled that defendant treating physicians were not expert witnesses for Rule 220 purposes and could be required to render opinions on the

standard of care without having been disclosed as expert witnesses. (*Fawcett v. Reinertsen* (1989), 131 Ill. 2d 380, 546 N.E.2d 558.) Plaintiff argues that notwithstanding the fact that a treating physician at trial testifies to matters within his expertise, even though beyond the scope of his own acts done in treatment, the opposing party should not be allowed to complain that he was taken by surprise. Therefore, such testimony does not require the physician's pretrial disclosure as an expert witness. (*Cochran v. Great Atlantic & Pacific Tea Co.* (1990), 203 Ill. App. 3d 935, 561 N.E.2d 229.) In *Boatman's National Bank v. Martin* (1992), 223 Ill. App. 3d 740, 585 N.E.2d 1328, a treating physician was permitted to testify as an expert on the standard of care, although he was not previously disclosed as a Rule 220 expert. The court held that the supplying of additional medical records did not transform a treating doctor into a Rule 220 expert.

The admission of evidence rests largely within the discretion of the trial court, and its decision will be reversed only when such discretion has been clearly abused. (*Christopherson v. Hyster Co.* (1978), 58 Ill. App. 3d 791, 804, 374 N.E.2d 858.) The court may limit the number of witnesses called as experts; however, the discretion must be reasonably exercised, so as to deprive the parties of no material rights, and an abuse of it in this respect will be reversible error. (*In re Estate of Porter* (1963), 43 Ill. App. 2d 416, 422, 193 N.E.2d 617.) The relevant inquiry is whether the trial court improperly excluded evidence so as to deprive plaintiff of a fair trial. *Gaenzele v. B.E. Wallace Products Corp.* (1976), 39 Ill. App. 3d 93, 350 N.E.2d 571.

■ In the instant case, the trial court's decision to grant Dr. Oyama's motion *in limine* seeking to prohibit Dr. Rosenow's testimony that Dr. Oyama deviated from the standard of care, as cumulative with Dr. Freeark's testimony, deprived plaintiff of a fair trial. In granting Dr. Oyama's motion *in limine*, the trial court barred Dr. Freeark's testimony that Dr. Oyama deviated from the standard of care required of him and caused injury to plaintiff. Also, Dr. Oyama's motion *in limine* barred testimony by each of plaintiff's retained experts that defendants Oyama and Southwest deviated from the standard of care causing injury to plaintiff, as cumulative. Based upon objections by Doctors Gerber and Aguinaldo which were sustained by the trial court, Dr. Freeark was also precluded from testifying that Doctors Gerber and Aguinaldo deviated from the standard of care and caused injury to plaintiff.

Furthermore, Dr. Rosenow was precluded from testifying subject to Rule 220. Also, Dr. Rosenow was precluded from testifying that if plaintiff had pain on November 20, 1984, the abscess was diagnosable at that time because such testimony was cumulative of the testimony

already rendered by Dr. Freeark. Doctors Gerber and Flashner in their motion *in limine* precluded testimony by Doctors Zaid and Sharifi that Dr. Gerber deviated from the standard of care.

It is necessary for a plaintiff to show by expert testimony not only that the injury occurred, but that such an event does not ordinarily occur in the normal course of events without negligence. (*Huff v. Condell Memorial Hospital* (1972), 4 Ill. App. 3d 352, 280 N.E.2d 495.) Plaintiff was deprived of a fair trial because he was not able to adequately present to the jury his theory. Since there was no other expert testimony on the issue of standard of care, Dr. Rosenow's testimony was not cumulative. The decision of the trial court to exclude all of plaintiff's expert medical witnesses under these circumstances was an abuse of discretion. *Hyster Co.*, 58 Ill. App. 3d 791, 374 N.E.2d 858.

A motion for an offer of proof was made and granted by the trial court. Dr. Rosenow testified at the offer of proof that the medical care rendered at the Officenter, on November 20, 1984, did not meet the standard of care because of the incorrect diagnosis of a kidney stone which was not pursued. The violation of the standard of care resulted in damage caused by the delay in the treatment of the perirectal abscess. Dr. Rosenow further testified that the emergency room doctor violated the standard of care by failing to diagnose the perirectal abscess and by failing to call a surgeon. Dr. Oyama also violated the standard of care because of his delay in calling Dr. Rosenow, the surgeon, after the diagnosis. While the doctors who saw the patient first caused more harm, the delay attributable to Dr. Oyama did not do the patient any good and probably caused harm. In her consult report, she used the word "neglected" in referring to the natural history of a perirectal abscess left untreated and the fact that the condition will proceed from the type of infection plaintiff had.

The orders granting motions *in limine* barring Dr. Rosenow's testimony about the standard of care rendered by Doctors Aguinaldo and Oyama were in error since treating physicians are not bound by disclosure under Rule 220. *Boatman's National Bank*, 223 Ill. App. 3d 740.

The third issue is whether the trial court erred by barring Dr. Gary Zaid's testimony that defendant's conduct caused injury to plaintiff. At trial, Dr. Zaid was asked:

"Q. You cannot quantify the greater harm it led to, can you?

A. I can't specifically quantify, but I can say it led to greater harm.

Q. I am trying to determine whether you know exactly what harm it led you to.

A. I am saying his ultimate outcome was affected by delay in diagnosis and treatment."

The court sustained the defendant's objection, saying that "Based upon the deposition Dr. Zaid cannot give an opinion that the delay caused the Fournier's gangrene, and since he could not—since he said he did not have an opinion as to the extent of the damage caused he cannot give an opinion that the damage to the scrotum, which apparently is a resultant injury from the alleged delay, he cannot give that opinion." However, a full reading of Dr. Zaid's deposition testimony reveals that there was no inconsistency. Following the above question and answer, Dr. Zaid testified:

"Q. As to the time period now relative to when Dr. Oyama actually saw the patient and when the surgical consult was actually obtained, do you have an opinion based upon a reasonable degree of medical certainty as to the extent or nature of damage sustained by Mr. Pyskaty?

A. Again, I can only say that delay in definitive therapy increased the amount of harm that Mr. Pyskaty sustained.

Q. Okay. And you can't be any more specific than that, doctor?

A. I would leave it to that.

All I can say is that this is—it probably would have decreased the amount of harm he sustained from the abscess, that's if he was operated earlier.

Q. Again, you cannot be any more specific than that.

A. I would leave that to the surgeons, that's what Mr. Henry was referring to.

Q. Okay. And you, in fact, then have no opinion concerning the extent of damage actually sustained by Mr. Pyskaty in view of the delay from the time when the surgeon, Dr. Rosenow, saw him on the next day.?

A. Yes, I cannot specify, but I do believe it increased the amount of damage done.

Q. I understand. But would I be correct in saying you do not have an opinion based upon a reasonable degree of medical certainty as to how much damage was caused this patient from the time he was examined in the emergency room until the time of the ultimate surgery, you just have an opinion that delay did not help?

A. No. I do believe that delay in this patient of having the procedure not done within a couple of hours definitely led to further spread of that abscess and to other areas, and I strongly believe, in light of the patient having acute urinary retention, that the ultimate outcome was directly affected by the delay.

Q. Do you have an opinion based upon a reasonable degree of

medical certainty as to exactly how his ultimate outcome was affected?

A. I think I just said that I didn't.

Q. I mean, do you know how this patient ended up?

A. The records that I have reviewed and the physician's reports, he was diagnosed ultimately as having a Fournier's gangrene and apparently ended up losing quite a bit of tissue in the scrotal area and around there due to that, you know, type of infection. And I can keep going.

***

A. As I stated earlier, it is my belief that the delay in having a definitive surgical procedure done on Mr. Pyskaty increased the risk and the possibility that he had the ultimate outcome he did, an abscess with an infectious process. The sooner you go ahead and definitively treat it the less likely you are going to have, of showing the severe outcome. It's as simple as that.

* * *

Certainly. And maybe I can do it in, again, one paragraph, that with this disease entity that he had, an ischiorectal abscess, this process will spread to any structure it gets a chance to, as any abscess will, until you go ahead and definitively treat it, that if the definitive therapy had been done and been diagnosed and treated properly in the early stages, there is a good probability you would have eliminated the amount of damage that Mr. Pyskaty had to go to other structures, and that the fact that when he was coming in there he had warning signs screaming at you, not only do I have an infection, but I cannot urinate, at this point would lead one to suspect, gosh, this is spreading and it's spreading further, we need to go in there and drain this now to prevent it going into his scrotum or any other structures. And, again, with abscesses you need to drain them as soon as possible. And it's my belief and my opinion that the delay of definitive therapy led to greater harm to Mr. Pyskaty.

Q. You cannot quantify the greater harm it led to, can you?

A. I can't specifically quantify, but I can say it led to greater harm.

Q. I am just trying to determine whether you know exactly what harm it led you to.

A. I am saying his ultimate outcome was affected by delay in diagnosis and treatment."

Dr. Zaid's testimony on the offer of proof was as follows:

"Based upon a reasonable degree of medical certainty Dr. Oyama's treatment of the plaintiff violated the standard of care because of a significant delay in treatment of the perirectal

abscess. In his opinion the deviation of the standard of care by Dr. Oyama caused harm to the plaintiff. Based upon a reasonable degree of medical certainty the care rendered by the emergency room physician violated the standard of care by including a perirectal abscess in her differential diagnosis but failing to call for an immediate surgical consult for treatment. The failing to have prompt surgical drainage caused harm to the plaintiff and that the ultimate outcome was affected because the degree of damage is directly related to the time the abscess was left sitting. Based upon a reasonable degree of medical certainty, Dr. Gerber, the Officenter physician violated the standard of care in her treatment of the plaintiff on November 20, 1984. The violation of the standard of care by Dr. Gerber caused harm to the plaintiff. The failure to diagnosis [sic] the abscess allowed it to spread to other organs and cause further damage."

■ The trial court's ruling in barring Dr. Zaid's testimony was error, in that there was in fact no inconsistency in his deposition testimony and the proposed trial testimony to which defendant's objection was sustained. The plaintiff at trial sought to elicit an opinion as to whether the delay in diagnosis and treatment caused injury to the plaintiff. Clearly, Dr. Zaid in his deposition testimony consistently stated that the plaintiff was harmed by the delay. Furthermore, his deposition testimony consistently stated that he could not state the extent to which the delay caused harm to the plaintiff. The trial court sustained defendant's objection to Dr. Zaid's testimony based on a portion of his deposition testimony which was not inconsistent with his proposed trial testimony, *i.e.*, that he was unable to quantify the extent of the injury caused by the delay. In this connection, see *Russell v. Subbiah* (1986), 149 Ill. App. 3d 268, 500 N.E.2d 138, where the medical expert's opinion that the delay in diagnosis was causally related to plaintiff's injury was not impaired by his unwillingness to express an opinion as to the extent of the resulting increase in damage to plaintiff's spinal cord which was attributable to the delay, as opposed to the tumor itself, or the precise length of time by which plaintiff's recovery was extended because of defendant's negligence. Accordingly, with respect to the grant of this motion *in limine*, we reverse.

The fourth issue is whether the trial court erred in granting defendant Oyama's motion *in limine* barring testimony that the delay in ordering plaintiff's surgery occurred on Thanksgiving Day. In granting defendant's motion *in limine*, the court reasoned there was no evidence that the delay was because it was Thanksgiving Day and "[t]hat is a conclusion, a presumption." The basic rules governing whether a motion *in limine* should be granted are: (1) the court must

decide whether, as the moving party asserts, the rules of evidence require exclusion of the subject matter of the motion; and (2) if they do not, the motion must be denied. However, if the rules require the exclusion of this evidence, the circuit court has discretion to grant the motion and to enter an order before trial excluding the evidence, or to deny the motion and to leave to the moving party the procedure of objecting to the evidence when it is offered at trial. *Department of Public Works & Buildings v. Roehrig* (1976), 45 Ill. App. 3d 189, 359 N.E.2d 752.

■ Dr. Oyama first treated the plaintiff at about 1 p.m., on November 22, 1984, which was Thanksgiving Day. Plaintiff contends that the surgeon who was on call, Dr. Rosenow, would have come over if she had been told about the patient and would have operated on plaintiff that day. Plaintiff contends that the jury can draw the inference in this case that the delay in treatment was caused by the holiday and not by any medical considerations. The trial court barred plaintiff's testimony about Thanksgiving Day, reasoning that plaintiff does not have evidence that the delay in his surgery was because it was Thanksgiving Day, and that was a conclusion, a presumption on plaintiff's part. The trial court's decision to grant defendant's motion to bar testimony about the delay occurring on Thanksgiving Day was an abuse of discretion. (*Hyster Co.*, 58 Ill. App. 3d 791, 374 N.E.2d 858.) It was a fact that November 22, 1984, was Thanksgiving Day, and the jury could reasonably conclude or infer that the delay in scheduling plaintiff's surgery was caused thereby and not for any medical considerations. The moving party did not assert a rule of evidence that requires the exclusion of the subject matter of the motion. *Department of Public Works & Buildings*, 45 Ill. App. 3d 189, 359 N.E.2d 752.

The fifth issue is whether the trial court erred in barring the testimony about plaintiff's medical condition when Dr. Rosenow first saw plaintiff. Doctors Gerber and Flashner filed a motion *in limine* seeking to prohibit certain expert testimony against them by Dr. Rosenow. In their motion *in limine*, Gerber and Flashner sought to bar Rosenow's testimony that: (1) in her consultation report she used the term "neglected" to describe the condition of plaintiff's abscess; (2) that she was "upset" that she had not been called earlier since she is of the opinion that the prior care was negligent; (3) she was "critical" of the treatment provided at the Doctors Officenter; and (4) if plaintiff had pain on November 20, 1984, the abscess was diagnosable at that time and such testimony is cumulative of the testimony already rendered by Dr. Freeark. The trial court granted the motion *in limine*.

The rule in Illinois is that since the trier of fact is not required to accept the opinion of the expert, opinion testimony regarding the ultimate issue in the case does not usurp the province of the jury. (*Baikie v. Luther High School South* (1977), 51 Ill. App. 3d 405, 411, 366 N.E.2d 542.) While opinion evidence is admissible even on the ultimate issue for the jury's determination, it is not absolutely admissible in all cases. (*Arnold N. May Builders, Inc. v. Bruketta* (1978), 60 Ill. App. 3d 926, 932, 377 N.E.2d 579.) The court in *Bruketta* defined the standard by which opinion on ultimate issue is admissible as follows:

> "Like all evidence, the probative value of opinion evidence must be balanced against its potential prejudicial effect and the jury's need. 'The real test is whether the testimony makes a real contribution toward the task of reaching an intelligent result.' [Citation]." (60 Ill. App. 3d at 932.)

> "It is equally clear that a shifting standard of admissibility must be applied as the opinion evidence shifts from answering questions on the outer rim of relevance toward answering the question at the central hub of the controversy." (60 Ill. App. 3d at 930-31.)

> "Therefore, the standard for determining admissibility should be most strictly applied." (60 Ill. App. 3d at 931.)

> "If the witness would have difficulty in testifying without expressing his opinion on the ultimate issue, where for example industry customs or practices are at issue, then the special purpose for which the opinion is offered has been held as weighing in favor of admission." (60 Ill. App. 3d at 933.)

> "A number of factors enter into this balancing or weighing process, including the complexity of the subjects involved, the purpose for which the opinion is offered, the relation to the ultimate issue to be determined, and the danger of undue prejudice." (60 Ill. App. 3d at 930.)

> "*** 'While there has been a reluctance to permit expert testimony on many matters on the basis that it invades the province of the jury, confuses the issues and usurps the function of the jury, the trend is to permit expert testimony in matters which are complicated and outside the knowledge or understanding of the average person ***.' [Citation]." 60 Ill. App. 3d at 933.

In the case at bar, Dr. Rosenow, a surgeon, was called to consult

on plaintiff's case. Her examination showed a large abscess in the skin of the right side of plaintiff's buttock near his rectum. The skin of the infected area was broken and pus was draining. Dr. Rosenow testified at the offer of proof that plaintiff was angry and distressed at the time she examined him. She said her response was, "What the hell is going on here, why hasn't this been taken care of before now, because it was clear to me that this infection had been going on for some time, it was neglected." Dr. Rosenow testified at the offer of proof that she noted the word "neglected" in her initial consultation report to describe plaintiff's condition. Dr. Rosenow said she used the word "neglected" in referring to the natural history of a perirectal abscess left untreated. Furthermore, it has been established that Dr. Rosenow is qualified to testify as an expert.

 In the instant case, causation of injury to plaintiff is a complicated matter and outside the knowledge or understanding of the average person. The expert opinion would enable the jurors to draw the inference from the evidence which their want of knowledge would otherwise prevent. (*Bruketta*, 60 Ill. App. 3d 926, 377 N.E.2d 579.) The record makes it clear that the cause of injury to plaintiff was an issue in this case, thus is not on the outer rim of relevance, but instead is on the ultimate issue at the hub of the controversy that the jury must decide. The probative value balanced against its potential prejudicial effect and its contribution to the jury's understanding of the facts in issue justifies admission. Dr. Rosenow testified at the offer of proof that she noted the word "neglected" in her initial consultation report to describe her medical assessment of plaintiff's condition. Dr. Rosenow said she used the word "neglected" in referring to the natural history of a perirectal abscess left untreated. There was a need for Dr. Rosenow to explain and clarify a complex matter to aid the jury's understanding; therefore, the purpose for which this opinion evidence is offered justifies its admission by the trial court.

At trial, counsel for Flashner and Doctors Officenter objected to testimony by plaintiff that Dr. Rosenow seemed "very irate" the first time she examined him. Plaintiff contends that the trial court erred in sustaining the objection. Also, the trial court sustained defendants' objection to plaintiff's testimony about what Dr. Rosenow told him at the time she examined him. Plaintiff contends that the trial court erred in barring testimony of conversation which occurred when Dr. Rosenow first examined him. A review of the record on appeal reveals that no basis for the objection was articulated in the record. Furthermore, plaintiff failed to cite authority to support his argument in his brief on appeal.

■ Supreme Court Rule 341(e)(7) provides that the appellant's brief shall contain argument which shall contain the contentions of the appellant and the reasons thereof, with citations of authorities. (145 Ill. 2d R. 341(e)(7).) Argument unsupported by citation to legal authority in a brief constitutes waiver of that argument by a court of review. (*Wasleff v. Dever* (1990), 194 Ill. App. 3d 147, 156, 550 N.E.2d 1132; *Mazur v. Hunt* (1992), 227 Ill. App. 3d 785, 793, 592 N.E.2d 335.) Thus, because plaintiff failed to cite authority to support his argument, we deem that argument waived, and the trial court's findings on this issue stand. *Nancy's Home of Stuffed Pizza, Inc. v. Cirrincione* (1986), 144 Ill. App. 3d 934, 939, 494 N.E.2d 795.

The sixth issue is whether the trial court erred in barring photographs of plaintiff's injuries. Plaintiff sought to admit photographs that were taken during the operation. Plaintiff contends that to introduce the photographs would show the actual nature and extent of the injury, being the infection of the tissue. The trial court barred admission of the photographs because, "They are prejudicial as far as the probative value. It is illustrative of what the surgeon saw. It is illustrative to the condition of the plaintiff during the time of the operation." The trial court held that the photographs had no real probative value.

Admission of photographic evidence is judged by the abuse of discretion standard. (*Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 541 N.E.2d 643.) Photographs should be excluded if their probative value is outweighed by their prejudicial effect. (*Bart v. Union Oil Co.* (1989), 185 Ill. App. 3d 64, 540 N.E.2d 770.) There is no abuse of discretion in excluding photographs of plaintiff's injuries where those injuries are adequately described in testimony. *Eckley v. St. Therese Hospital* (1978), 62 Ill. App. 3d 299, 379 N.E.2d 306; *Villegas v. Kercher* (1956), 11 Ill. App. 2d 282, 137 N.E.2d 92.

Some of the photographs depicted plaintiff in the midst of the surgical procedure while he was under a general anesthetic. They are representative neither of plaintiff's condition when he saw Dr. Gerber nor of his condition after surgery. They could have only prejudiced the defendants' defense, as the trial court anticipated when it excluded them.

■ Plaintiff and several medical witnesses gave extensive testimony about the nature and scope of plaintiff's claimed injuries. Witnesses recounted plaintiff's symptoms and condition when he was admitted to the hospital and during office visits. Plaintiff graphically described his condition. Thus, the exclusion of the photographs did not deny plaintiff an adequate opportunity to present the nature of

his injuries to the jury. The trial court correctly balanced prejudice and probative value when it decided in favor of the exclusion. *Union Oil Co.*, 185 Ill. App. 3d 64.

The next issue is whether the trial court erred in barring the admission of plaintiff's medical bills. During the direct testimony of Dr. Rosenow, plaintiff sought to have his medical bills admitted into evidence. Doctors Gerber and Flashner objected to this testimony unless the witness could quantify which of the bills or expenses are attributable to their negligence and which ones he would have had notwithstanding their negligence. The trial court permitted Dr. Rosenow to testify as to which of her own bills were necessitated by defendants' alleged negligence.

■ In violation of Supreme Court Rule 341(e)(7), the appellant's brief did not contain argument which contained the contentions of the appellant and the reasons thereof, with citations of authorities. (145 Ill. 2d R. 341(e)(7).) As previously stated, argument unsupported by citation to legal authority in a brief constitutes waiver of that argument by a court of review. (*Dever*, 194 Ill. App. 3d at 156; *Hunt*, 227 Ill. App. 3d at 793.) Thus, because plaintiff failed to cite authority to support his argument, we deem that argument waived, and the trial court's findings on this issue stand. *Cirrincione*, 144 Ill. App. 3d at 939.

We next must determine whether plaintiff established an agency relationship between Dr. Gerber and Dr. Flashner. In his motion for a directed verdict, Dr. Flashner alleged that plaintiff sought recovery from Dr. Gerber, individually, and Bruce Flashner, individually and d/b/a Flashner Medical Partnership/The Doctor's Emergency Officenter, and that the Flashner Medical Partnership and the Doctor's Emergency Officenter are not parties to this lawsuit because plaintiff has filed suit against Bruce Flashner, M.D. Dr. Flashner further alleged that plaintiff has not presented any evidence to indicate that an agency relationship did in fact exist between Dr. Gerber and Dr. Flashner. Dr. Flashner additionally contends that plaintiff failed to establish that he was injured as a result of the alleged negligence of Dr. Gerber because Dr. Freeark could not state the extent to which the delay attributable to Dr. Gerber caused damage to plaintiff.

Section 9(1) of the Uniform Partnership Act provides:

"Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution of the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the

particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority." 805 ILCS Ann. 205/9 (Michie 1993).

Section 12 of the Uniform Partnership Act provides:

"Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner." 805 ILCS Ann. 205/12 (Michie 1993).

Section 2—205 of the Illinois Code of Civil Procedure provides:

"A partnership sued in its firm name may be served by leaving a copy of the process with any partner personally or with any agent of the partnership found anywhere in the State. A partnership sued in its firm name may also be notified by publication and mail in like manner and with like effect as individuals." 735 ILCS Ann. 5/2—205 (Michie 1993).

In *Japczyk v. Gust K. Newburg Construction Co.* (1991), 224 Ill. App. 3d 325, 586 N.E.2d 572, summons was served on Paschen Contractors, Inc. (Paschen), both individually and d/b/a the Newberg-Paschen Joint Venture (joint venture). This summons was returned to the office of the Cook County sheriff as having been personally served. The *Paschen* court held that in serving Paschen, a partner in the joint venture sued in the firm name, plaintiff also served the joint venture.

In the instant case, on August 9, 1985, summons was returned to the office of the Cook County sheriff as having been personally served, on Bruce Flashner, individually and in his capacity as an agent for Flashner Medical Partnership. Therefore, as in *Paschen*, in serving Flashner, a partner in Flashner Medical Partnership/The Doctors Emergency Officenter (Doctors Officenter), plaintiff also served Flashner Medical Partnership.

■ The burden of proving existence of agency relationship and scope of authority is on the party seeking to charge the alleged principal. (*Anderson v. Boy Scouts of America, Inc.* (1992), 226 Ill. App. 3d 440, 444, 589 N.E.2d 892.) The existence and extent of an agency relationship may be established by circumstantial evidence based upon an examination of the situation of the parties, their acts, and other relevant circumstances. (*HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.* (1989), 131 Ill. 2d 145, 545 N.E.2d 672.) Apparent authority or authority by estoppel flows from the acts of a principal and is distinguished in the case law from implied authority

which derives from circumstantial evidence. (*Northern Trust Co. v. St. Francis Hospital* (1988), 168 Ill. App. 3d 270, 278, 522 N.E.2d 699.) To prove apparent authority one must establish: (1) the principal's consent to or knowing acquiescence in the agent's exercise of authority, (2) the third party's knowledge of the facts and good-faith belief that the agent possessed such authority, and (3) the third person's detrimental reliance on the agent's apparent authority. (*Weil, Freiburg & Thomas v. Sara Lee Corp.* (1991), 218 Ill. App. 3d 383, 390, 577 N.E.2d 1344.) Moreover, the extent of an agent's authority may also be shown by ascertaining what a reasonably prudent person exercising diligence and discretion in dealing with the agent might believe the agent to possess based on the principal's conduct. *Wasleff*, 194 Ill. App. 3d at 157.

A presumption of an agency may arise from an employer-employee relationship. (194 Ill. App. 3d at 156.) For an employer to be vicariously liable for an employee's tort under the doctrine of *respondeat superior*, the torts must have been committed within the scope of the employment. (*Landrus v. Eagle Wings Industries, Inc.* (1992), 236 Ill. App. 3d 711, 715, 603 N.E.2d 816.) No precise definition has been accorded the term scope of employment, but broad criteria have been enunciated:

"(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, \*\*\*

\*\*\*

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Pyne v. Witmer* (1989), 129 Ill. 2d 351, 360, 543 N.E.2d 1304.

■ Flashner's contention that he cannot be held liable for any actions of Dr. Gerber because plaintiff did not establish an agency relationship between him and Dr. Gerber is without merit. Flashner's answer to paragraph one of count II of plaintiff's complaint admitted to ownership or possession of partnership property and admitted that its agents, employees, and doctors worked in office space leased by the Doctors Officenter, at 5434 South Pulaski Road. Flashner admitted in paragraph 6 of count II that defendants Doctors Officenter and Gerber rendered medical care and treatment to plaintiff

on November 18 and 20, 1984. Additionally, Dr. Gerber testified at trial that she was a partner in Doctors Officenter in November of 1984 at the time she treated plaintiff. The evidence presented by plaintiff demonstrates that Flashner was a partner in the Flashner Medical Partnership and he was properly served. Therefore, the order granting Flashner a directed verdict was in error.

The final issue is whether the plaintiff met the burden of proof to establish the existence of any agency relationship between Emergency Medical Services and Dr. Aguinaldo. The existence and scope of an agency relationship are usually questions of fact to be decided by the trier of fact, unless the parties' relationship is so clear as to be undisputed. (*Northern Trust Co.*, 168 Ill. App. 3d 270, 522 N.E.2d 699.) The principles of agency have already been outlined, therefore, and will not be repeated.

In *Northern Trust Co.*, the application of the principles of agency were applied and the court concluded that the nonexistence of an actual agency relationship between Dr. Adusumilli and the hospital was so clear as to be undisputed. The uncontradicted evidence revealed that the hospital neither employed nor paid Dr. Adusumilli. Rather, Dr. Adusumilli was hired, trained, employed, scheduled, and paid by Medical Emergency Services Agency (MESA). The court held Dr. Adusumilli, therefore, lacked the necessary employer-employee or actual agency relationship with the hospital required to impose vicarious liability on a *respondeat superior* theory.

Defendant contends that plaintiff has not presented any evidence which supports an agency relationship between Emergency Medical Services, S.C., and Dr. Aguinaldo and, in fact, Dr. Aguinaldo testified that she was an independent contractor for the group. Plaintiff contends that Dr. Aguinaldo, the emergency room doctor, testified at trial that she was affiliated with the corporation, Medical Services, S.C., which provides doctors to emergency rooms at various hospitals, including Little Company of Mary Hospital. Plaintiff provided a medical bill for emergency room medical services rendered to plaintiff by Dr. Aguinaldo and directing payment be made to Medical Services, S.C.

Plaintiff alleged in his fourth amended complaint that on November 21, 1984, Medical Services provided emergency room physicians to Little Company of Mary Hospital, including its agent, servant and employee, Aguinaldo. In response to plaintiff's fourth amended complaint, both Medical Services, S.C., and Dr. Aguinaldo, in separate responses but represented by the same attorneys, admitted "only that emergency room service in part were [*sic*] provided through Medical Services, S.C."

Plaintiff's first set of interrogatories requested Medical Services to "State the name and address, state and hours where Dr. Maria Aguinaldo is scheduled to work for the next sixty (60) days for Medical Services, S.C." In responses Medical Services stated, "Dr. Maria Aguinaldo does not work for Medical Services, S.C. Without waiver to the form of the question propounded, Medical Services, S.C., is aware that Dr. Aguinaldo is scheduled to work as follows." Medical Services gave the location, dates and time Dr. Aguinaldo was scheduled to work at Little Company of Mary Hospital.

Furthermore, in number 5 of a second set of interrogatories to Medical Services plaintiff asked Medical Services, "In November, 1984, did this defendant have any relationship with Maria Aguinaldo, M.D., which resulted in her performing as a physician in the Emergency Room of Little Company of Mary Hospital?" Medical Services responded, "Objection. Interrogatory 5 is vague, ambiguous and incapable of answer in its current form; further answering, and without waiving its objection to the form of interrogatory 5, this defendant states that Dr. Maria Aguinaldo's status was that of an independent contractor." Plaintiff's interrogatory 6 asks Medical Services, "If the answer to Interrogatory 5 is yes, state (a) the nature of the relationship with Maria Aguinaldo, M.D., (b) list all contracts, memoranda, or other documents which memorialize or otherwise document said relationship." In response to interrogatory 6 Medical Services stated, "See answer to Interrogatory 5." Plaintiff's interrogatory 7 requests Medical Services to "List every fact upon which this defendant denied the allegations of paragraph 4 of the Second Amended Complaint which states: At all times herein mentioned Medical Services, S.C. (Medical Services), an Illinois Corporation, provided personnel including Defendant, Aguinaldo, at Little Company of Mary Hospital to perform medical services in the Emergency Room. At all times herein mentioned Aguinaldo was an agent, servant and employee of Medical Services acting within the scope of said agency, service and [e]mployment." In response Medical Services stated, "Objection. Interrogatory 7 is vague, ambiguous and incapable of answer in its current form. Further answering and without waiving its objection to the form of Interrogatory 7, this defendant states that it based its denial of the allegations contained in Paragraph 4 of plaintiff's Second Amended Complaint at law upon the vague, ambiguous, overbroad conclusion of law and evidence and, further, upon the status of Dr. Aguinaldo at all relevant times herein as that of an independent contractor."

In its motion for partial summary judgment, Little Company of Mary Hospital asserted that the October 1983 agreement between

Little Company of Mary Hospital, Inc., and Medical Services, S.C., which supplied Dr. Aguinaldo to Little Company of Mary Hospital, specifically states that physicians provided by Medical Services, S.C., were to perform as independent contractors. Little Company of Mary Hospital specifically stated that Dr. Aguinaldo was not an employee, agent or servant of Little Company of Mary Hospital on the date in question. In response to plaintiff's request to admit facts, Medical Services, S.C., and Dr. Aguinaldo, who were represented by the same attorneys, admitted that Dr. Aguinaldo treated plaintiff on November 22, 1984, in the emergency room at Little Company of Mary Hospital.

As previously stated, the existence and extent of an agency relationship may be established by circumstantial evidence based upon an examination of the situation of the parties, their acts, and relevant circumstances. (*HPI Health Care Services, Inc.*, 131 Ill. 2d 145, 545 N.E.2d 672.) A presumption of agency may arise from an employer-employee relationship. *Weil, Freiburg & Thomas*, 218 Ill. App. 3d at 390.

In the case at bar, unlike *Northern Trust Co.*, the nonexistence of any actual agency relationship was not so clear as to be undisputed. Dr. Aguinaldo was employed and scheduled by the Emergency Medical Services. Dr. Aguinaldo admitted to affiliation with Medical Services. Furthermore, medical bills to plaintiff were paid to Medical Services for services provided by Dr. Aguinaldo, which is circumstantial evidence that Dr. Aguinaldo may have been paid by Medical Services. Medical Services did not present evidence to overcome the presumption of agency based upon an employer-employee relationship. (*Weil, Freiburg & Thomas*, 218 Ill. App. 3d at 390.) Therefore this evidence supports an agency relationship between Emergency Medical Services and Dr. Aguinaldo and Medical Services' motion for a directed verdict was in error.

Accordingly, for the foregoing reasons, the decision of the trial court to: (1) bar the testimony of Dr. Freeark from testifying that Dr. Oyama had violated the required medical standard of care and that violation caused injury to plaintiff is reversed; (2) bar the testimony of the treating surgeon on the issues of violation of standard of care by the defendants and causation of damages to plaintiff is reversed; (3) bar Dr. Gary Zaid's testimony that defendants' conduct caused injury to plaintiff is reversed; (4) grant defendant Oyama's motion *in limine* barring testimony that the delay in ordering plaintiff surgery occurred on Thanksgiving Day is reversed; (5) bar the testimony about plaintiff's medical condition when Dr. Rosenow first saw plaintiff is reversed; (6) bar photographs of plaintiff's injuries is affirmed; (7) deny the admission of the medical bills shall be affirmed;

(8) grant defendant Flashner's Medical Partnership a directed verdict is reversed; and (9) grant Medical Services' motion for a directed verdict is reversed. This cause of action is remanded to the trial court for appropriate action not inconsistent with this opinion.

Reversed in part, affirmed in part and cause remanded.

BUCKLEY and O'CONNOR, JJ., concur.