**LONG BEACH MORTGAGE COMPANY, Plaintiff,**

v.

**Henry F. WHITE, et al., Defendants.**

**No. 95 C 4068.**

United States District Court, N.D. Illinois, Eastern Division.

March 11, 1996.

James Andrew Romanyak, Larry L. Thompson, Ari J. Rosenthal, James William Joseph (Bell, Boyd & Lloyd), for Plaintiff.

Howard Brookins and Thaddeus Leonard Wilson for Henry F. White.

Lazar Pol Raynal (McDermott, Will & Emery), for Frederick Moore and Mary R. White.

Lawrence S. Bloom and Michael James Falconer for Robert Threatte.

Garry A. Payton for Val Jean F. Hillman.

David Antony Dong for James Koechle.

Warren Lupel and Michael B. Weininger (Katz, Randall & Weinberg) for Edwin Cabey.

Robert W. Earhart and Michael D. Walsh for QC Inc. and J.F. Caputo.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Long Beach Mortgage Company ("Long Beach") has reached settlement agreements with a number of defendants—Edwin Cabey, Elveria Ferguson, Jean Val Jean F. Hillman, James Koechle ("Koechle") and Frederick Moore (collectively "Settling Defendants")—in this multidefendant fraud case, and Long Beach's counsel has represented that settlements are also essentially concluded with all other defendants except for J.F. Caputo ("Caputo"). Among the conditions precedent

to the effectiveness of the several settlement agreements between Long Beach and Settling Defendants is a provision that this Court must enter a settlement bar order that (1) will preclude any nonsettling defendant who may later be held liable to Long Beach from seeking contribution against any Settling Defendant and (2) will allow Long Beach to apply the proceeds received from Settling Defendants against the obligations as set forth in the respective settlement agreements.

Caputo has objected to the second aspect of that condition but not the first, on the ground that Long Beach's proposed application of proceeds would expose him to more than his fair share of the total liability for Long Beach's losses from the fraudulent transactions at issue in the case. That dispute has been fully briefed by Caputo and Long Beach and is therefore ripe for decision by this Court.[1]

It is quite true, as Caputo claims, that he was not originally in on the ground floor of the fraudulent scheme hatched by other codefendants in this action. Instead Caputo's only participation in the overall scheme consisted of a bogus appraisal review on one of the two properties on which Long Beach was induced to make inflated mortgage loans—almost identical in amount—that were predicated on bogus "sales" of the properties at enormously inflated prices.

Because federal jurisdiction over this action is predicated on diversity of citizenship (and because the entire set of events at issue was Illinois-based), Caputo correctly urges that the Illinois Joint Tortfeasor Contribution Act ("Act," 740 ILCS 100/0.01 to 100/5 [2]) applies to define the respective rights and obligations of the joint tortfeasors and, of course, of victim Long Beach as well. But for more reasons than one, Caputo's attempted invocation of the Act to support his position rests on false premises.

Before those premises are examined, it should however be made clear that Long Beach's own effort to take the Act effectively out of play are unwarranted. Long Beach begins with the unarguable proposition (based on the plain language of Act § 2) that the right of contribution is available only against parties liable in tort (correctly citing for that proposition *Hahn v. Norfolk & W. Ry.*, 241 Ill.App.3d 97, 101, 181 Ill.Dec. 610, 614, 608 N.E.2d 683, 687 (5th Dist.1993)). But Long Beach then proceeds impermissibly to point to the decision in *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 201–06, 131 Ill.Dec. 155, 165–67, 538 N.E.2d 530, 540–42 as standing for the proposition that "[u]nder Illinois law, intentional torts are not covered by the Contribution Act" (Long Beach Mem. 3). What *Gerill* actually held was that an intentional tortfeasor (a category that embraces all of the Settling Defendants) are not entitled to seek or to obtain contribution under the Act. What it did not address was the obverse side of that coin: whether a negligent tortfeasor (that is the only level of culpability charged to Caputo) may obtain contribution from fellow tortfeasors whose torts were intentional.

In the course of its discussion *Gerill*, 128 Ill.2d at 204–05, 131 Ill.Dec. at 167, 538 N.E.2d at 542 referred to and quoted from the legislative statements that were made during the course of the Act's passage through the General Assembly and that "demonstrate[d] that the statute was meant to create a right of contribution for negligent tortfeasors." That statutory purpose would be served rather than disserved by giving Caputo access to the provisions of the Act, and it is certainly not negated by the decision in *Gerill*. Nor has either party identified a case (and this Court has found none) that suggests that the Act's benefits are unavailable to a negligent tortfeasor who wants to elicit contribution from an intentional (and

---

1. For present purposes Caputo will be assumed to be "guilty as charged"—to be liable to Long Beach for the actions that are alleged against him in Long Beach's Complaint (were it otherwise, any consideration of the settlement-bar condition raised by Long Beach's agreements with Settling Defendants would be purely hypothetical). Caputo's liability is at issue in two

other pending motions, which this Court expects to examine shortly.

2. Citations to that statute will take the form "Act §—," omitting entirely "740 ILCS 100/" and thus reflecting only the internal numbering of the Act.

presumably more culpable) joint tortfeasor.[3] Accordingly this opinion will proceed on the premise that Caputo could, if he qualified, call upon the Act's provisions for assistance.

But as indicated earlier, that does not help Caputo here. Under the Act a good faith settlement between a plaintiff and one or more of a group of tortfeasors extinguishes any otherwise applicable right of contribution of nonsettling defendants (Act §§ 2(a) and (d)) and also reduces plaintiff's potential recovery on claims against those nonsettling defendants to the extent of the greater of two amounts: the amount stated in the releases given to the settling tortfeasors or the amount of the consideration actually paid for those releases (Act § 2(c)). Caputo Mem. 5, citing *Rice v. McDonald's Corp.*, 268 Ill. App.3d 201, 205 Ill.Dec. 926, 644 N.E.2d 482 (5th Dist.1994), urges that the purpose of the Act is to protect him against the possibility of paying more than his "fair share" of Long Beach's damages. But that case dealt with the right of contribution under Act §§ 2(a) and (b), and *not* with the effect (as prescribed by other Act provisions) of a settlement on nonsettling defendants. Caputo's position glosses over entirely the even more basic proposition that in any joint and several liability situation the intended operation of the Act, and its expressly-stated purpose (Act § 4), is to preserve the right of the injured party to full recovery if a nonsettling defendant has a sufficiently deep pocket (*Henry v. St. John's Hosp.*, 138 Ill.2d 533, 150 Ill.Dec. 523, 563 N.E.2d 410 (1990)).

To focus on the matter in a simpler context that highlights the problem, suppose for example a $1 million injury caused by two equally responsible joint tortfeasors A and B. Assume that A settles with plaintiff for say $250,000 (it will be assumed that nonsettling defendant B did not commit an intentional tort, which under *Gerill* would totally disqualify B from seeking contribution). If A's settlement is found to have been entered into in good faith, taking into account all of the relevant factors (including risks of litigation) involved in such a determination, nonsettling defendant B cannot complain—either in the later trial of the action with plaintiff that results in a $1 million verdict in plaintiff's favor[4] or by a consequent effort to obtain contribution from A—that B's being stuck with a net $750,000 liability means that B has been required to bear more than a "fair share" of the victim's damages. Indeed, the appropriateness of such a result under the Act is precisely the thrust of the thoughtful and extended discussion in *Henry*.

One of the natural and intended consequences of early settlements is to substitute certainty for risk as between the settling parties. Caputo himself recognizes that the goal of the Act is to encourage settlements in multilitigant cases (both parties cite *Higginbottom v. Pillsbury Co.*, 232 Ill.App.3d 240, 246, 173 Ill.Dec. 219, 223, 596 N.E.2d 843, 847 (5th Dist.1992)). Any defendant such as Caputo who chooses to roll the dice instead of settling—thus risking total liability (which is after all the meaning of the joint and several liability concept)—cannot complain if that gamble turns out to be a bad one. After all, Caputo has been just as free as his codefendants to reach a settlement with Long Beach.

As Long Beach correctly points out (citing *Pyskaty v. Oyama*, 266 Ill.App.3d 801, 812, 204 Ill.Dec. 328, 337–38, 641 N.E.2d 552, 561–62 (1st Dist.1994)), parties must be deemed joint tortfeasors where their concurrent actions injure a plaintiff, even though they may "share no common purpose or duty and fail to act in concert." That concept certainly applies (perhaps even a fortiori) in the circumstances here, and hence Long Beach remains free to pursue any or all of

---

**3.** On the contrary, *Ziarko v. Soo Line R.R.*, 161 Ill.2d 267, 282, 204 Ill.Dec. 178, 185, 641 N.E.2d 402, 409 (1994) has held—after an extended treatment of the subject—that under the Act even a defendant guilty of wilful and wanton (though not intentional) misconduct may seek contribution from a merely negligent tortfeasor. That being so, it would be totally bizarre to preclude a tortfeasor who is even *less* at fault (negligent rather than wilful and wanton) from obtaining contribution from a tortfeasor who is even *more* at fault (an intentional rather than merely negligent wrongdoer).

**4.** Under Act § 2(c) that $1 million verdict would of course be reduced, in terms of plaintiff's actual right of recovery, by the $250,000 previously paid by A.

the tortfeasors that caused its injuries and with whom it has not settled—in this instance Caputo.

It is also conventional wisdom that a party to whom obligations run from a number of other parties may apply any realized proceeds to the best advantage of the injured party (see, e.g., *Herget Nat'l Bank v. USLife Title Ins. Co.*, 809 F.2d 413, 417–18 (7th Cir.1987), applying Illinois law), with the obvious exception being a situation in which that type of application would work an injustice (*id.* at 418, quoting *Village of Winfield v. Reliance Ins. Co.*, 64 Ill.App.2d 253, 258, 212 N.E.2d 10, 12 (2d Dist.1965)). Here there is no question of the bona fides of Long Beach's settlements with Settling Defendants—even Caputo does not challenge that (Caputo Mem. 6), and it is of course his burden to establish the absence of good faith by clear and convincing evidence (*Higginbottom*, 232 Ill.App.3d at 249, 173 Ill.Dec. at 225, 596 N.E.2d at 849). What Caputo complains about instead is that if Long Beach is permitted to allocate what it collects from Settling Defendants toward the partial (but not total) satisfaction of the damages that Long Beach has sustained from the fraudulent transaction in which those Settling Defendants participated but Caputo did not, Caputo would suffer unjust treatment.

That however differs neither in degree nor in kind from the natural consequences of joint and several liability, as exemplified by the earlier-discussed hypothetical example of settling tortfeasor A and nonsettling tortfeasor B. Even if Long Beach were hereafter to collect 100 cents on the dollar of its claim against Caputo, it would still not be rendered whole by the overall recovery that it has received from Settling Defendants, plus what it expects to receive from the other defen-

dants whose settlements are in the works and plus the hoped-for recovery from Caputo as judgment debtor. If conversely Caputo were to succeed with his present objection, thus further reducing Long Beach's ability to approach (let alone to attain) a full recovery of its losses, Caputo would receive an undeserved windfall by getting credit against his liability for some portion of the amounts that have been paid by other codefendants.[5] And that injustice would be visited on Long Beach, not on Caputo.[6]

### Conclusion

Caputo's objections to Long Beach's Motion for Good Faith Finding and Settlement Bar are wanting in merit. Long Beach's motion is granted, and this Court is today approving the requested order (1) approving the several settlement agreements, (2) finding that they were entered into in good faith and are fair and reasonable, (3) enjoining any proceedings (including actions for contribution or indemnity) by Caputo or any other nonsettling defendant against any of the Settling Defendants, (4) approving the proposed application of the proceeds of the current settlements and (5) dismissing Long Beach's Second Amended Complaint against all of the Settling Defendants with prejudice and without costs (except for Koechle's obligation to bear costs).[7] This ruling also results in the dismissal as moot of Long Beach's pending but not-fully-briefed motion for summary judgment against each of the Settling Defendants.

### Appendix

This opinion stands on its own for the reasons that have been set out in its text. Nevertheless it is worth noting parentheti-

---

5. See also the Appendix to this opinion.

6. Actually the result would be even worse than what has just been said in the text: Absent the requested settlement bar order, the negotiated settlements would become ineffective by their own terms.

7. After this opinion had been dictated and transcribed, this Court learned that the order just described in the text had already been both filed in the Clerk's Office under seal and docketed, bearing a date of February 20, 1996. That had

come about because this Court had already signed the order when it was tendered before it was learned that Caputo was opposing its entry, and because it was then inadvertently processed by the Clerk's Office. Due to the logistical complexity that would be encountered in undoing that processing so that the order could be re-dated today, the order will simply be left in its present form—but its date of entry for all purposes is today (March 11, 1996) rather than the February 20 date that it bears.

cally that Caputo's argument in which he objects to Long Beach's allocation of the settlement proceeds derived from the Settling Defendants may be somewhat suspect even on its own terms. This Appendix explains why.

It will be recalled that Long Beach was defrauded in two mortgage transactions involving the same modus operandi: the "flipping" of the mortgaged property through a bona fide purchase at its lower fair market value, followed immediately by a bogus "sale" at a highly inflated value. Both mortgage applications had come to Long Beach in early 1995 from the same mortgage broker (Delta Mortgage Company), both properties were purportedly in the Hyde Park area (though they were in fact in nearby depressed areas), and both applications drew purported support from appraisals included in the package, each of them prepared by now codefendant James Koechle and each of them predicated on the wrongfully inflated value of the subject property and of purportedly comparable properties.

Although it is true that Caputo was involved as a review appraiser with only one of the two properties, and although he is charged with negligent misrepresentation and not with fraudulent intent, it is at least a fair inference that if Caputo had done his job right the wild disparity in values on the property that he *did* appraise—it had been listed on the market for months at a $45,000 figure, yet $420,000 was the purported "sale" price on which Long Beach was asked to (and did) make a 70% mortgage loan of $294,000!—would have cast the deep cloud of suspicion on the other contemplated transaction (which was another 70% loan of $309,400 on a purported "sale" price of $442,000 of a property that had been listed for sale at a far lower figure). And the further inference is certainly reasonable that even a modest investigation of that second loan, triggered by Caputo's disclosure of (rather than his having negligently overlooked) the much much lower listing price of the Indiana Property, also would have uncovered the true facts as to the other property before rather than after the second loan was made (only a month after

the loan transaction in the Caputo-appraised property).

Hence it looks very much as though but for Caputo's negligent misrepresentations—matters on which Long Beach unquestionably relied to its detriment in making the loan and sustaining injury on the Indiana Property—Long Beach would not have sustained injury by making the second loan on the other property either. It is unnecessary for present purposes to decide whether that "but-for" approach might equate to a proximate cause standard in quantifying Caputo's liability. For now it is enough to say that any examination of the equitable considerations that could come into play in allocating the proceeds received from Settling Defendants would *not* point to any lessening of Caputo's liability for the transaction in which he *was* directly involved.