2026 IL App (1st) 252669-U
Order filed: June 24, 2026

FIRST DISTRICT
THIRD DIVISION

No. 1-25-2669

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| In re MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| ERIC A. PATRICK, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 2017 D 10523 |
| and | ) | |
| | ) | |
| JENNIFER L. BAKER, | ) | Honorable |
| | ) | H. Yvonne Coleman, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Martin and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the modification judgment granting the father the sole authority for decision-making as to the children's medical care and education.

¶ 2    Jennifer L. Baker, respondent, and Eric A. Patrick, petitioner, engaged in post-dissolution litigation which resulted in the modification of their parental decision-making and parenting time as to their minor children. On appeal, Jennifer challenges certain evidentiary rulings as well as the portion of the modification judgment which granted Eric sole authority for decision-making as to the children's medical care and education. She does not appeal from the modification of parenting time. We affirm.

¶ 3    Eric and Jennifer were married in 2001 and have two children, a daughter, B.P. (born in 2010) and a son, E.P. (born in 2012). Eric filed a petition for dissolution of marriage under the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/501 *et seq*. (West 2012)) on December 14, 2017. Prior to the filing of the petition, Eric and Jennifer reached agreement as to the care of the children and the division of their assets and liabilities. On December 28, 2017, the circuit court entered a judgment for dissolution of marriage (dissolution judgment) and an allocation of parental responsibility and parenting plan judgment (allocation judgment) which incorporated their agreements.

¶ 4    The allocation judgment provided that Eric and Jennifer (parents) would share responsibility for major decisions relating to the children's health care. Unless both parents agreed in writing, the children were to stay with their current care providers as long as the providers were available or affiliated with the applicable medical insurance plan. The children were to continue to attend their current school, Chicago Friends School, and attend high school in a district in which one of the parents lived unless the parents agreed otherwise. The parents were to share responsibility for all other major education decisions through high school. During the school year, Eric had weekly parenting time of two nights and during the summer he had parenting time of three nights.

¶ 5    In February 2024, Eric filed a petition to modify parenting time and alleged that when the children are with Jennifer, they have been frequently tardy for school. Eric contended that much of his parenting time was being taken up by transporting the children to various extracurricular activities and he sought additional parenting time during the week. In her response to the petition, Jennifer explained that in September 2023, E.P. was diagnosed with autism spectrum disorder, attention-deficit disorder, and anxiety. Because E.P. becomes dysregulated with disruptions to his

routine, a change in parenting time would negatively impact his well-being.

¶ 6    On May 6, 2024, Jennifer filed a petition to modify parental decision-making authority and sought sole responsibility and authority for significant decisions. She asserted that Eric does not acknowledge the extent of E.P.'s disabilities or support necessary interventions. Because Chicago Friends School no longer meets E.P.'s educational needs, she was working to develop an Individualized Education Program (IEP). Eric has refused to participate in this process. In his written objection to the petition, Eric maintained that he had been working with E.P.'s treaters, teachers, and the Evanston Skokie School District 65 (District 65), the school district where E.P. resides to ensure that E.P. has the necessary academic services.

¶ 7    On June 20, 2024, the court appointed David Sternfield as the guardian *ad litem* (GAL) for the children as to the issues of parenting time and decision-making.

¶ 8    Eric brought an emergency motion on July 17, 2024, seeking to enjoin Jennifer from unilaterally enrolling E.P. in a new school, having E.P. tested and suing District 65. Eric claimed that Jennifer rejected District 65's IEP for E.P. and had hired an education lawyer to "fight" the IEP. The attorney had recommended that E.P. undergo more testing. Additionally, Jennifer recently took E.P. to visit Cove School, a school for children with learning disabilities. In her written response, Jennifer explained that she is "currently researching E.P.'s options" and has not taken any action which is "dispositive." The court denied Eric's emergency motion on July 19, 2024.

¶ 9    In an August 8, 2024, order the court permitted Jennifer "to retain her chosen educational attorney," Matt Cohen of Matt Cohen and Associates (Cohen firm), allowed Eric and the GAL "full access" to the Cohen firm and directed Jennifer to execute releases to facilitate that access. The court, on August 15, ordered that E.P. be enrolled in Cove School for the 2024-2025 school

year.

¶ 10 On September 27, 2024, Eric brought an emergency motion seeking to restrict Jennifer's medical decision-making authority. According to the motion, Jennifer brought E.P. to a new doctor who placed E.P. on Escitalopram, a selective serotonin reuptake inhibitor (SSRI) without Eric's knowledge or consent and over his previously voiced objection to such medicine. In her written response, Jennifer explained that she took E.P. for his annual physical on September 24. E.P.'s doctor had retired so another doctor in the practice saw E.P. That doctor renewed an existing prescription for Lexapro, an SSRI which E.P. had taken in the past to treat anxiety. At the suggestion of his psychiatrist, E.P. stopped taking Lexapro a few months ago.

¶ 11 The court entered an order on October 9, 2024, providing that neither parent shall take any unilateral action concerning the medical care of the children including scheduling medical appointments and evaluations or testing and obtaining or administering medications without the consent of the other parent.

¶ 12 On October 16, 2024, Jennifer filed an emergency motion for mental health treatment for E.P. Jennifer asserted that although the GAL had recommended that she and Eric obtain a new psychiatrist for E.P., they had not agreed to one. As a result, E.P. had been without a psychiatrist for two months. After a hearing on October 23, the court entered an order directing that Eric and Jennifer each submit the names of three possible psychiatrists within 72 hours. The court ordered the GAL to select a psychiatrist from the submitted names, and for Eric and Jennifer to schedule an appointment for E.P. with the chosen psychiatrist within 72 hours of the GAL's selection.

¶ 13 On December 5, 2024, the court entered an order (December trial order), which set a trial on all pending matters beginning March 25, 2025. The order also provided that any request for a written report from the GAL must be made in writing by January 1, 2025.

¶ 14    On February 7, 2025, the court continued the trial to May 19, 2025. The court set May 12 for the exchange of stipulations and lists of exhibits and witnesses.

¶ 15    On May 12, 2025, Jennifer moved to voluntarily dismiss her May 6, 2024, petition to modify parental decision making. On that date, she also filed a list of numerous trial witnesses. The list included: Stephanie Garvey, E.P.'s speech therapist; Christina Peters, E.P.'s therapist; Dr. Rebecca Cho, E.P.'s current psychiatrist; Dr. Jonathan Bloomberg, E.P.'s former psychiatrist; Rachel Tercek and Margot Touris, neuropsychologists who had evaluated E.P.; and Kathleen Zintsmaster, E.P.'s occupational therapist.

¶ 16    On May 15, 2025, Jennifer sought leave to file an amended response to Eric's petition to modify parenting time in which she now suggested a modification of the allocation judgment which would allow for equal parenting time.

¶ 17    Eric brought a motion *in limine* seeking to bar Jennifer from calling the identified witnesses who were E.P.'s mental health providers prohibited from testifying under section 5 of the Mental Health and Developmental Disabilities Confidentiality Act (Mental Health Act) (740 ILCS 110/5 (West 2022)) without consent. Eric also sought to bar witnesses never identified by Jennifer and never interviewed by the GAL.

¶ 18    Jennifer argued that the mental health providers should not be barred as witnesses because E.P. had signed releases under the Mental Health Act (HIPPA releases). Eric responded that the HIPPA releases which he received from Jennifer wrongly stated that E.P. was over 18 years old, did not meet the requirements of the Mental Health Act, and were otherwise invalid because E.P. had not understood the nature and purpose of the releases that he signed. The court found that the HIPPA releases were not valid and barred the testimony of Peters, Dr. Bloomberg, Zintsmaster, Touris, Tercek, and Garvey.

¶ 19    Eric also moved to bar Jennifer from calling witnesses who were not previously disclosed or who received a trial subpoena without notice to Eric. This motion was granted.

¶ 20    Jennifer moved to bar the testimony of the GAL. In her motion, Jennifer argued that section 506(a)(2) of the Marriage Act (750 ILCS 5/506(a)(2) (West 2024)) required the GAL to issue a written report 30 days prior to trial. The GAL failed to issue such a written report and instead sent an e-mail just before the trial was to begin, indicating that he would recommend that Eric have sole decision-making on education and medical issues involving the children. The court denied Jennifer's motion but allowed discovery on the GAL's recommendation and a deposition of the GAL.

¶ 21    On June 2, 2025, Eric filed an amended petition for modification of parental responsibilities and sought "sole decision-making authority over the Minor Children's medical and educational matters." Jennifer later filed a response to the amended petition.

¶ 22    On June 20, 2025, Jennifer filed a motion to reconsider the court's in *limine* order barring her witnesses from testifying under the Mental Health Act. She argued that E.P.'s HIPPA releases were valid and that the copies of the releases which Eric submitted to the court were somehow altered without her knowledge to indicate that E.P. was over the age of 18. In response, Eric sought discovery as to the claim that the releases had been altered and issued subpoenas to Jennifer's counsel and Peters relating to the authentication of records and the HIPPA releases. Jennifer subsequently voluntarily dismissed her motion to reconsider the *in limine* order.

¶ 23    On July 24, 2025, Jennifer filed a motion to compel the testimony of Peters, Dr. Bloomberg, Touris, and Lauren Crane, a social worker, and Megan Clancy, clinical director at Cove School and attached "updated" HIPPA releases. She argued that even if the HIPPA releases were invalid, the court had the authority to compel the witnesses to testify about E.P.'s mental

health. The court denied the motion to compel.

¶ 24     On August 27, 2025, the court began a trial on the pending petitions.

¶ 25     Eric testified that he is a professor at Northwestern University and that his schedule allows him to transport the children to and from school and supervise them after school.

¶ 26     During the 2024-2025 school year and on his parenting days, Eric did not fail to bring E.P. to school and E.P. was tardy only one time and that was after a medical appointment. Cove School records showed that during the 2024-2025 school year and when Jennifer had the children, E.P. was absent 10 times and tardy 7 times. Eric believed that missing classes is harmful to E.P.'s academic progress and need for regulation.

¶ 27     Eric helps E.P. with his homework and his speech therapy home exercises. E.P. told Eric that Jennifer rarely helps with the exercises. E.P. does not always complete his homework when he is staying with Jennifer.

¶ 28     Eric believes Jennifer does not understand how to control E.P.'s impulsive behavior. Jennifer and E.P. frequently verbally argue and the arguments can turn physical. On one occasion, Jennifer put E.P. in the common hallway of her building in his underwear and locked him out. At another time, in January 2025, E.P. and a friend ran away from Jennifer's home, and Jennifer did not know where they were.

¶ 29     In late January 2025, Jennifer sent Eric a message that while driving the children to school, E.P. became "extremely unsafe" and was hurting her and B.P. She said that she will need to take E.P. to a hospital the next time this happens. Eric has never had any similar experience with E.P. and disagreed that E.P. needs to be hospitalized for acting out. E.P. has not been physically violent with him or in his home and he has never restrained E.P.

¶ 30     E.P. has come to Eric's home unbathed. When E.P. is at Jennifer's home, E.P. and Jennifer

will co-sleep. Eric did not know how frequently that occurred. Eric thinks E.P. watches television more and goes to bed later when with Jennifer.

¶ 31    Eric did not believe the current allocation of medical decision-making was in the best interest of the children. For example, Eric had concerns about E.P. taking SSRI medications. In the spring of 2024, Jennifer, Eric and Dr. Bloomberg agreed that E.P. should stop taking an SSRI drug as it was not working and had negative side effects. Dr. Bloomberg suggested the use of a mood stabilizer drug instead, but Eric objected. Dr. Bloomberg then suggested that E.P. be further evaluated but Jennifer disagreed with that proposal. Subsequently Eric learned that Jennifer obtained a prescription for a SSRI drug for E.P. without Eric's knowledge.

¶ 32    After the October 23, 2024, order was entered in response to Jennifer's emergency motion, the GAL chose Dr. Cho as E.P.'s new psychiatrist. Eric executed the paperwork  allowing Dr. Cho to immediately treat E.P. but Jennifer delayed completing her paperwork despite her earlier emergency motion stating that E.P. should receive immediate mental health treatment. As a result, E.P. did not begin to see Dr. Cho until late December 2024 or early January 2025.

¶ 33    Eric believes Peters, who has been E.P.'s therapist since preschool, is no longer "a good fit" as she does not have special training in treating children with speech issues or anxiety. B.P. also sees a therapist. Without his agreement and over his objection, Jennifer removed B.P. from her prior therapist after the therapist asked that B.P. be on time and ready for the appointments. Without notifying him, Jennifer chose an executive functioning coach for B.P.

¶ 34    Eric sought sole medical decision-making as being in the best interest of the children especially because Jennifer makes "impulsive" medical decisions which are poorly thought out. Eric asserted that if he was given sole decision-making, he would keep Jennifer informed and collaborate with her.

¶ 35    Eric also requested sole authority for the children's educational decisions. Since the post-dissolution litigation began, Jennifer has taken actions on her own as to E.P.'s education without consulting Eric. She unilaterally rejected the District 65 IEP and sued District 65, hired Cohen, and had E.P. tested at the Cove School without informing Eric. If given sole authority as to E.P.'s educational decisions he would keep Jennifer apprised and consider her wishes as well as E.P.'s best interests.

¶ 36    Jennifer testified that she teaches classes at Northwestern University and Columbia College and works "a few hours" at a boutique. Her work schedule allows her to take the children to school and their activities and ensure that they are fed and bathed and do their homework. She helps E.P. with his school and speech therapist homework. E.P.'s absences from school generally are due to illnesses or medical appointments.

¶ 37    In 2023, Tercek evaluated E.P. and diagnosed him as having attention deficit hyperactivity disorder (ADHD), autism, and generalized anxiety disorder. E.P. also has learning disabilities and speech apraxia.

¶ 38    E.P. becomes dysregulated. Jennifer described dysregulation as when a "child doesn't have control over what they are doing, and often times that child has to be restrained." She says E.P.'s dysregulations occur cyclically, sometimes happening once a week and sometimes not occurring for months. In the last 18 months E.P. became dysregulated 10 to 15 times. The cycles have improved since E.P. transferred to the Cove School and after Dr. Cho prescribed Guanfacine, a medication used to treat ADHD. To calm E.P., she will change the subject, rub his back, or have him do physical or breathing exercises.

¶ 39    On one occasion, in winter 2025, after 9 p.m., she twice put E.P. in the vestibule of her building in his underwear after he became dysregulated and could not be controlled. E.P.

eventually calmed down.

¶ 40    On January 27, 2025, as Jennifer drove the children to school, E.P. took off his seatbelt and was kicking, throwing things, and pulling B.P. After failing to calm E.P., Jennifer phoned Peters who told her that she may have to bring E.P. to the hospital. E.P. eventually calmed down and she drove him to school.

¶ 41    E.P. sleeps in her bed (zero to one time per week) when he is having nightmares or anxiety. There have been 10 to 20 times in the last year when she has denied E.P.'s request to sleep with her because she believed he was fine to sleep in his own room.

¶ 42    When the children are with her, they brush their teeth twice daily and shower daily. She limits E.P.'s screen and television time and monitors the content. E.P. did view pornography both at her home and Eric's home. She spoke to E.P. about it and asked his therapist to discuss the topic with him.

¶ 43    In the summer of 2024, she and Eric participated in two or three meetings with District 65 about its IEP, which recommended that E.P. attend King Arts School. She did not sign the IEP because it did not "fit [E.P.'s] needs." She then retained the Cohen firm to assist in changing the IEP so that E.P. could be placed in a school which was a better fit and allow for reimbursement of the tuition. She signed the consent form to allow Eric access to the Cohen firm.

¶ 44    She also gathered information about potential schools. Without informing Eric, she retained Touris, who prepared a neuropsychological report dated April 9, 2025. Jennifer enrolled E.P. at Cove School in the 2024-2025 school year. At first E.P. had social issues with some children in his class and used his phone "unsafely" but these problems have been resolved. E.P. likes attending the school.

¶ 45    District 65 has agreed to pay E.P.'s tuition at Cove School for the 2025-2026 school year.

The district will review the decision annually.

¶ 46    B.P. attends Evanston Township High School which "is perfect for her." Based on a 2023 neuropsychological evaluation, B.P. has an executive functioning coach for organizational assistance.

¶ 47    Jennifer did not believe that it was in the children's best interest for Eric to have sole decision-making authority as to their education. He did not assist in researching the best school for E.P. Eric disagreed with sending E.P. to Cove School for summer school.

¶ 48    Jennifer makes the children's doctors' appointments and chooses their doctors, therapists and other providers. Since 2024, Eric has not disagreed with her choice of medical providers.

¶ 49    She believed both parents should be involved in deciding medical issues. She wants to make sure that E.P. receives the support needed. Eric questions Peters as a therapist despite the fact that E.P. has a long relationship with Peters and trusts her. Although Dr. Bloomberg removed E.P. from a SSRI in the early summer of 2024, she asked the pediatrician for the SSRI prescription during E.P.'s checkup in the fall of 2024. She would not have given E.P. the medicine unless Eric approved.

¶ 50    After learning that the GAL had chosen Dr. Cho, she met with the doctor but then had trouble completing the required paperwork because of technology issues and needing clarification from the doctor as to certain questions. Dr. Cho received her completed paperwork in December and E.P. had his first appointment with her in January 2025.  Dr. Cho prescribed Guanfacine for E.P. in February or March of 2025 to treat his ADHD and the medicine has had positive effects. In May or June 2025, she and Eric met with Dr. Cho who suggested that E.P.'s Guanfacine dosage be increased. Eric did not agree with that recommendation. Dr. Cho wrote a prescription for the higher dose and told them to administer it to E.P. if any "issues" came up. Jennifer ultimately

administered the higher dosage and Eric "followed along."

¶ 51    During Eric's parenting time last summer, E.P. fell off his bicycle and hit his head on the ground. Eric took E.P. to the emergency room but declined the option of having E.P. undergo a CAT scan. Eric was told to make a follow-up appointment with E.P.'s doctor but he did not do so. Jennifer learned about the accident when E.P. texted her that day.

¶ 52    On cross-examination, Jennifer testified that when E.P. first started at Cove School he would often get dysregulated. The school social worker informed her that the dysregulations had since decreased.  She has spoken to E.P.'s teachers without telling Eric but only on insignificant topics.  She did not believe that E.P's absences caused dysregulation.

¶ 53    E.P. frequently yells at Jennifer and throws things at her, including heavy items, and on occasions she has used her arms to restrain him. She may have pulled his hair "by accident."

¶ 54    E.P. once ran away from her home while she was picking up B.P. After running away, E.P went to a store where he shop-lifted some items, then went to Eric's home.

¶ 55    In May 2025, Jennifer was present when E.P. signed the HIPPA releases. She explained to E.P. that the releases meant that "people who are helping you are able to come and talk to other people."  She did not see that the releases stated that E.P. was over 18 years old.

¶ 56    On redirect-examination, Jennifer said that in the last year, she has restrained E.P. two times. She described the restraint as a bear hug that keeps E.P.'s arms from flailing.

¶ 57    Karen Carney, head of Chicago Friends School, testified that B.P. and E.P. both attended the school and she knows them very well. Before he left the school in 2024 after fifth grade, E.P. was encountering academic and social difficulties and she had many meetings with Eric and Jennifer. They were both interested and active parents. While a student at Chicago Friends School, E.P. would become dysregulated and hide or destroy other students' possessions, jump around or

make animal noises during classes. She thought Cove School was a good fit for E.P.

¶ 58    When called as a witness by Jennifer, Eric testified that if he was given sole authority for medical decision-making, he would replace Peters with a therapist who specialized in autism, ADHD, anxiety and E.P.'s other disorders. He believes E.P. would quickly adapt to a new therapist.

¶ 59    Eric agreed that Cove School was better than Chicago Friends School for E.P. If given sole decision-making authority he would not take E.P. from Cove School for this school year. If District 65 did not agree to reimburse the tuition for future school years he would consider other academic options.

¶ 60    Eric did not want E.P. to go to school during the past summer. He thought E.P. needed a break, "a moment to just do his thing as a kid," in that he has had a full schedule of school, therapies, and math tutoring.

¶ 61    He declined the CAT scan when E.P. fell off his bicycle because the doctor did not find any signs of concussion and said that the test was "frowned upon" for children due to its high radiation.

¶ 62    E.P. does not have tantrums or dysregulations when with Eric. When E.P. becomes upset, Eric will have him go to his bedroom and calm down. Eric admitted that one time, about four years ago, he slapped E.P. across the face. He had allowed E.P. to go play soccer at a nearby park. Eric subsequently learned that E.P. was not at the park. E.P. did not answer his cell phone and later returned home after going to stores to buy candy. Eric was upset and scared and slapped E.P.  Eric said it was a "big parenting [fail] and I certainly regret it."

¶ 63    Prior to the testimony of the GAL, Eric sought the admission of the GAL's "Important Case Notes" (notes) pursuant to section 506(a)(2) of the Marriage Act. *Id.* The GAL had produced

the notes to the parties before his deposition. They provided a summary of his investigation, including his interviews with various witnesses, and contained his updated recommendations. The court admitted the notes subject to cross-examination.

¶ 64     Jennifer moved to bar the GAL from testifying because he failed to provide a written report 30 days prior to trial as required by section 506(a)(2) of the Marriage Act. *Id.* If the GAL was not barred, Jennifer asked that she be allowed to conduct *voir dire* as to his qualifications and methodology. The court denied the motion but stated that Jennifer would be allowed a full opportunity to cross-examine the GAL.

¶ 65     Sternfield testified that he has been an attorney since 1994 and has served as a GAL in the domestic relations division since 2019.

¶ 66     In his capacity as GAL, Sternfield spoke to several people, including Jennifer, Eric, B.P., E.P., Peters, Dr. Bloomberg, Dr. Cho, Garvey, and Cohen. Zintsmaster was on family leave and did not want to be contacted. Touris did not want to be interviewed because she had not received full payment from Jennifer.

¶ 67     Sternfield recommended that Eric be allocated sole decision-making authority for the children on medical and educational decisions and all other decisions be allocated jointly. E.P. should remain enrolled at Cove School until further order of court. Dr. Cho should continue to treat E.P., and the parents should follow the doctor's instructions concerning E.P.'s medication. The parents and children should attend family therapy.

¶ 68     From his interviews with the children, he learned that Jennifer's and E.P.'s conflicts happen regularly and "with a significant level of severity." B.P. described them as "explosive." The conflicts make B.P. uncomfortable and cause her a great amount of stress. B.P. has not observed Eric and E.P. having difficulties in interacting with each other. Jennifer has pulled E.P.'s hair,

pushed him and put him in the hallway.

¶ 69    Over the past few years, B.P. has often been late or absent from school when staying with Jennifer. The children said that Jennifer does not attend to their homework.

¶ 70    Sternfield believed that it was not in E.P.'s best interest to co-sleep with Jennifer as such co-sleeping hurts his understanding of social interactions. Putting him in the hallway during an argument is demoralizing and embarrassing. It is detrimental to E.P. to have altercations or his hair pulled.

¶ 71    Based on his discussions with Dr. Cho, the delay in E.P. beginning treatment was because Jennifer had refused to answer questions on the intake form. Sternfield attempted to communicate with Jennifer about the delay in filling out the form but was unsuccessful and her response by text was "confusing."

¶ 72    Sternfield talked to E.P. about the HIPPA releases in August 2025. Sternfield concluded that E.P. signed the releases without understanding their purpose and that he thought he did not have a choice about signing them. No one spoke to Sternfield about the releases prior to their execution.

¶ 73    Garvey informed Sternfeld that she has treated E.P. for significant speech problems since 2021. During the school year, she sees E.P. once a week for 55 minutes. On numerous occasions, E.P. has been dysregulated when he attended sessions with Garvey after spending time with Jennifer. The dysregulation would impact E.P.'s speaking rate and accuracy and intelligibility of speech. She has not observed dysregulation when E.P. has been with Eric.

¶ 74    Sternfield believes that E.P. suffers from anxiety and has difficulty understanding social conduct. Eric, though, has stated that E.P. does not suffer from anxiety due to his willingness to go outside and participate in numerous different types of activities. E.P. has at times been reluctant

to talk with Eric about his anxiety and his desire to take anti-anxiety medication. However, E.P. also told Sternfield that "over time" he has become more comfortable talking to Eric about his anxiety. Sternfield testified that Eric has "evolved" and "progressed" in his understanding of E.P.'s special needs.

¶ 75    At first, Sternfield's recommendation was that Eric have sole decision-making authority as to the children's medical treatment and that the parents share joint decision-making authority as to their education. He changed his recommendation after learning about Jennifer's unilateral actions, including having E.P. sign HIPPA releases without notice to Eric or to him. He believed that Eric was more likely to make decisions in the best interest of the children and determined that Eric should also have sole decision-making authority over the children's education.

¶ 76    The court denied Jennifer's motion to strike Sternfield's testimony.

¶ 77    Jennifer then called several witnesses who testified to their personal knowledge that she was a good parent to her children.

¶ 78    At the end of this testimony, the court, on October 9, 2025, set a briefing schedule on the motion to compel testimony of Touris and barred Peters from testifying. The court entered an order on October 30, 2025, stating that it "still finds, that the HIPPA releases signed by [E.P.] for his medical providers and Dr, Margot Touris fail to meet the statutory requirements of the [Mental Health Act]." The court found that Touris's neuropsychological evaluation report on E.P. was a business record which had been authenticated and was admissible, but the court barred her testimony because it was not "critical" for the determination of the issue of parental decision-making and E.P.'s best interests.

¶ 79    The court entered a memorandum opinion and order. The court modified the allocation judgment to provide that Eric and Jennifer would have joint decision-making authority over the

children's religion and extracurricular activities. Eric was to have sole decision-making authority on educational and medical decisions. He was to discuss all major educational and medical decisions with Jennifer and when there was no agreement, he had sole authority to make the decisions. Dr. Cho was to remain as E.P.'s psychiatrist and the parties were to follow her instructions as to E.P.'s medications.

¶ 80    Jennifer filed a timely appeal.

¶ 81    First, Jennifer argues that the court erred by modifying the allocation judgment and granting Eric sole decision-making authority as to the children's education and medical care, "particularly since Eric does not believe E.P. should be in a therapeutic school, denied the child suffers from an anxiety disorder, and challenges the psychiatrist's increasing the child's prescription dosage." Jennifer contends that she, not Eric, sought out the Cove School for E.P., has been more "proactive" in seeking therapies and treatments for the children, and is the "much stronger parent to advocate for [the] children." As such, the court should have maintained the *status quo* regarding parental decision-making for the children.

¶ 82    Section 610.5(c) of the Marriage Act states that:

"the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5(c) (West 2024).

¶ 83    Thus, to modify an allocation of parental rights, the court needs to find both that there has been a substantial change in circumstances and that modification is in the best interests of the

children. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 43. In determining the best interests of the child, the Marriage Act sets out over a dozen factors for the court to consider, including: the wishes of the child; the child's adjustment to his home, school, and community; the mental and physical health of all involved individuals; the ability of the parents to cooperate; the level of each parent's participation in past significant decision-making with respect to the child; the wishes of the parents; and the child's needs. 750 ILCS 5/602.5(c) (West 2024).

¶ 84 We will not reverse the court's best-interests findings or its allocation of parental responsibilities unless they are against the manifest weight of the evidence. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004). A finding is against the manifest weight of the evidence when the opposite conclusion is evident or the finding is unreasonable, arbitrary, or not based on the evidence. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 85 In its order modifying the allocation judgment, the court considered all the appropriate statutory factors. First, it considered whether there had been a substantial change in circumstances. The court noted that since the entry of the allocation judgment, E.P. has been diagnosed with autism, ADHD, anxiety, and speech apraxia. The parties "are no longer able to cooperate" to make decisions for their children, particularly concerning E.P.'s medical and educational needs. Therefore, the court found that a substantial change has occurred in the circumstances of both the children and the parents. The court's finding was not against the manifest weight of the evidence, where the evidence indeed showed that about six years after the allocation judgment, E.P.'s diagnosis was changed and the parties' cooperation with regard to his education and medical needs broke down, necessitating a modification of the allocation judgment.

¶ 86 The court next turned to the best-interest factors. With respect to the wishes of the parents and children, the court noted that Eric sought sole medical and education decision-making

responsibility for the children over Jennifer's objection. The wishes of the children had not been reported. With respect to the level of each parent's participation in past significant decision-making for the children, the court noted that both parents perform everyday caretaking functions for the children but that Jennifer has had a more "significant" role in their medical care in that she has been the parent who makes their medical appointments.

¶ 87     The court then focused its attention on the children's relationship with their parents and siblings, noting that the children reported to Sternfield that E.P. and Jennifer experience conflict, which B.P. described as "explosive" and causing her great stress and discomfort. E.P. described one such incident when he argued with Jennifer and she made him stand in the hallway outside the apartment in his underwear. Sternfield worried that Jennifer did not see the harm in treating E.P. in this manner. E.P.'s speech therapist has reported seeing E.P. dysregulated when arriving from Jennifer's home but has not seen E.P. dysregulated after arriving from Eric's home.

¶ 88     With respect to the children's adjustment to their home, school, and community, the court noted Sternfield's concerns about Jennifer's continuing inability to consistently bring the children to school on time and to her unawareness that missing significant class-time dysregulates E.P. Sternfield also reported a lack of structure in Jennifer's home, as she does not have routines for the children's hygiene, bedtime, or homework. Eric has the children shower every day, but Jennifer does not have any rules or schedule for showering. Sternfield also believes that by sometimes allowing E.P. to co-sleep with her at the age of 13, Jennifer is harming his "understanding of social interactions."

¶ 89     With respect to the mental and physical health of all individuals involved, Touris conduced a neuropsychological evaluation of E.P. in April 2025 and reaffirmed his diagnoses of autism, ADHD, and anxiety and recommended that he stay at the Cove School. However, the court noted

that Eric downplays E.P.'s mental health issues, insisting that some of his behaviors are characteristic of his age and maturity level and do not necessarily show that he suffers from anxiety. E.P. has not always felt comfortable telling Eric that he wants to continue taking anti-anxiety medicine. Sternfield found this to be "concerning," but also testified that E.P.'s "comfort level with Eric speaking to him about his mental health has improved." Meanwhile, Jennifer "overstates" E.P.'s mental health issues, insisting that all of his behaviors "are symptomatic of his several diagnoses." Jennifer takes an overly aggressive approach to E.P.'s treatment.

¶ 90    With respect to the children's needs, the court noted E.P. needs routine and consistency at home and at school. B.P. does not have special needs but feels stress and discomfort when Jennifer and E.P. fight. E.P.'s dysregulation, "heightened by Jennifer," negatively affects B.P.

¶ 91    Finally, with respect to the parents' ability to cooperate, the court noted that Jennifer initiated a search for a new school without Eric's involvement and also obtained a prescription for E.P. for an SSRI drug without Eric's knowledge or consent. Jennifer also provided E.P. with HIPPA releases, which were executed without Sternfield's knowledge or involvement. The HIPPA releases misstated that E.P. was over 18 years old and provided that Jennifer's attorneys could disseminate and share all of E.P.'s medical information in perpetuity, without any restrictions. Sternfield subsequently met with E.P. and determined that he did not understand the purposes of the HIPPA releases and misunderstood that he had "no choice" but to sign them.

¶ 92    The court noted that Sternfield recommends that Eric be granted sole decision-making responsibility for the children's medical care and education. The court cited Sternfield's testimony that, based on his investigation, he believes "Eric will make well-informed decisions about [E.P.'s] schooling, and was hopeful that he would heed the recommendation to keep [E.P.] at the Cove

School." The court also cited Eric's testimony that he would follow Dr. Cho's recommendations as to E.P.'s medication.

¶ 93    The court followed Sternfield's recommendation and granted Eric sole authority for decision-making as to the children's medical care and education.

¶ 94    We cannot say that the court's finding that it was in the best interest of the children to award Eric sole authority for decision-making as to their medical care and education was against the manifest weight of the evidence. The court examined each of the relevant statutory best-interest factors, noting the evidence regarding the dysfunctionality of E.P.'s home-life with Jennifer, their frequent, "explosive" arguments, and the lack of any structure or routine for the children's hygiene, bedtime, or homework. In addition to any lack of homework routine, the court noted the evidence that Jennifer frequently did not take the children to school and/or took them to school late and she failed to express any understanding as to how missing significant class-time facilitates E.P.'s dysregulation. With respect to the children's medical care, the court noted that Jennifer failed to consult with Eric when obtaining a prescription for E.P. for an SSRI drug and had E.P. sign HIPPA releases without informing Sternfield. The HIPPA releases contained inaccurate information about E.P.'s age, allowed Jennifer's attorneys to disseminate E.P.'s medical information without any restrictions in perpetuity, and were never adequately explained to E.P.

¶ 95    Based on Jennifer's failure to ensure the children's on-time attendance at school and completion of their homework, coupled with her failure to cooperate with and keep Eric and/or Sternfield informed regarding E.P.'s prescription and HIPPA releases, the court ordered that Eric would now be allocated sole decision-making authority for the children's education and medical care. However, the court further ordered Eric to keep E.P. enrolled at the Cove School per Touris's recommendation, to retain Dr. Cho as E.P.'s psychiatrist and follow her instructions regarding

medication, and to keep Jennifer apprised of all major medical decisions. The court's order effectively balanced the children's need for stability and routine in their educational and medical decisions by awarding decision-making to Eric, while ensuring that he would not use his new authority to upheave E.P.'s settled relationships with the Cove School and Dr. Cho. The court's order was soundly based on all the evidence at the hearing and was not unreasonable and arbitrary as to be against the manifest weight of the evidence.

¶ 96    Jennifer argues, though, that the trial court ignored all the evidence showing she is a good mother who makes sound decisions for her children's education and medical care.  Specifically, Jennifer argues that the evidence showed she is the "thought leader" who rejected the district's IEP as insufficient and took the steps leading to E.P.'s enrollment in the Cove School, where he is thriving. According to Jennfer; if she had not been so proactive, E.P. would still be struggling in public school. Jennifer also points to evidence showing that she, not Eric, petitioned for a new psychiatrist for E.P., which ultimately led to his treatment by Dr. Cho. Jennifer, not Eric, made the decision to administer the increased dosage of Guanfacine prescribed by Dr. Cho, which has benefited E.P. Jennifer, not Eric, recognizes that E.P. has anxiety, and it is Jennifer who E.P. feels comfortable talking to about his anxiety.

¶ 97    Jennifer contends that unlike her, Eric is often an "inactive" parent who has opted not to be involved in finding the appropriate schooling for E.P. and has chosen not to consult with the neuropsychologist, Touris. Jennifer asserts that the court ignored many of E.P.'s "alarming" behaviors which occurred "under Eric's watch," including his acting "inappropriately on the computer and phone" and visiting pornography sites while at Eric's house.

¶ 98    Jennifer also takes issue with some of the GAL's conclusions, disputing his findings that she does not have a regular shower schedule for the children and fails to provide them with

sufficient "structure." She points to evidence that she has a regular hygiene and homework "regime" at her home. Based on all this evidence of Jennifer's competent decision-making with respect to the children's education and medical care, she argues that the court erred in taking such decision-making away from her and giving it all to Eric.

¶ 99    Jennifer is effectively asking us to review the evidence *de novo* and rule in her favor based primarily on her testimony which conflicts with the court's findings. However, we do not review the court's allocation decision here *de novo* but instead review whether it was against the manifest weight of the evidence, meaning that the opposite conclusion is evident or the decision is unreasonable, arbitrary, and not based on the evidence. *Bates*, 212 Ill. 2d at 515; *Best*, 223 Ill. 2d at 350. The testimony of Eric and the GAL and the Important Case Notes support the court's finding that Jennifer's decision-making with respect to the children's education and medical care is concerning based on her failures to ensure the children's regular attendance at school and completion of their homework and her refusal to consult with Eric and the GAL when obtaining certain prescription medicine for E.P. and providing him with the HIPPA forms to sign. Although Jennifer's testimony conflicts with some of the testimony provided by Eric and the GAL and with the conclusions contained in the Important Case Notes, the trial court was in a better position than we are to "observe the temperaments and personalities of the parties and assess the credibility of witnesses." *In re Marriage of Stopher*, 328 Ill. App. 3d 1037, 1041 (2002). We will not substitute our judgment for the court's credibility determinations. *Best*, 223 Ill. 2d at 351. The court implicitly found Eric and the GAL to be more credible than Jennifer and determined to follow the GAL's recommendation that it was in the best interests of the children for the allocation judgment to be modified to give Eric sole-decision making for their education and medical care. On this record, we cannot say that the court's order was against the manifest weight of the evidence.

¶ 100   Next, Jennifer argues for reversal of several of the court's *in limine* rulings. The circuit court has great discretion in determining motions *in limine* and its ruling will not be disturbed absent an abuse of discretion. *Schiller v. HomeServices of Illinois, LLC*, 2024 IL App (3d) 220405, ¶ 28. An abuse of discretion occurs when no reasonable person would take the view adopted by the court. *Id.* Even if an abuse of discretion occurred, "it will not warrant reversal of the judgment unless the record indicates the existence of substantial prejudice affecting the outcome of the trial." *In re Leona W.*, 228 Ill. 2d 439, 460 (2008).

¶ 101   First, Jennifer contends that the court erred by granting Eric's motion *in limine* to quash and bar any witness from testifying who received a trial subpoena without notice to Eric.   The basis for Eric's motion was that Jennifer's failure to provide him with notice of the trial subpoenas violated Illinois Supreme Court Rule 12 (eff. July 1, 2017). Jennifer responded that notice of the trial subpoenas was not mandated under Rule 12. We need not resolve this issue, because in granting the motion, the court continued the trial and gave Jennifer time to provide Eric with the requisite notice. No witnesses were barred from testifying as a result of the initial failure to notify Eric of the subpoenas and therefore Jennifer has not shown any prejudice necessitating reversal of the judgment.

¶ 102   Next, Jennifer argues that the court erred by granting Eric's motion *in limine* to bar her from calling witnesses not previously investigated by the GAL as well as witnesses who were prohibited from testifying under section 5 of the Mental Health Act (740 ILCS 110/5 (West 2024)). Jennifer contends that the *in limine* order was entered based on the court's finding that the HIPPA releases signed by E.P. were invalid. She argues that instead of granting the motion *in limine*, the court should have given her the opportunity to make any necessary corrections to the HIPPA releases and then allowed her to call the witnesses at trial.

¶ 103   Where a motion *in limine* is granted, "the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court." *Snelson v. Kamm*, 204 Ill. 2d 1, 23 (2003). An offer of proof must inform the trial court, opposing counsel, and the reviewing court of the specific nature of the evidence sought to be introduced. *In re Marriage of Xinos and Marino*, 2025 IL App (1st) 232326, ¶ 25. Failure to make an offer of proof results in forfeiture of the issue on appeal. *Id.* In the present case, Jennifer failed to make an offer of proof of any of the witness' testimony, thereby forfeiting review of the *in limine* order. *Id.*

¶ 104   Jennifer subsequently filed a motion for entry of an order compelling the testimony of Peters and Touris, two of the witnesses barred from testifying under the *in limine* order because E.P.'s HIPPA releases were invalid. The court denied Jennifer's motion and she argues on appeal that the denial was erroneous because the HIPPA releases were valid as to Peters and Touris. Jennifer has again forfeited review by failing to make an offer of proof as to either Peters's or Touris's testimony. *Id.*

¶ 105   Next, Jennifer argues that the court erred by admitting the GAL's "Important Case Notes" containing the summary of his investigation, including his interviews with various witnesses, and his updated recommendation that Eric be awarded sole decision-making authority for the children's educational and medical needs. Jennifer contends that the GAL's Important Case Notes contain more than mere "notes" of his investigation but is actually a full-fledged "report" that was untimely under section 506(a)(2) of the Marriage Act (750 ILCS 5/506(a)(2) (West 2024)). Section 506(a)(2) provides:

> "Unless the court directs otherwise, the guardian *ad litem* shall submit to the court and the
>
> parties a written report, written recommendations, or a proposed parenting plan, in

accordance with the child's best interests, not less than 30 days before a final hearing or trial." *Id.*

¶ 106    Jennifer argues that the Important Case Notes were submitted to her nine days before trial and submitted to the court on the second day of trial in violation of section 506(a)(2), which requires that the GAL's report be submitted not less than 30 days before trial. Therefore, Jennifer contends that the Important Case Notes should not have been admitted into evidence.

¶ 107    Resolution of this issue requires us to construe section 506(a)(2). The primary rule of statutory construction is to ascertain and give effect to the legislative intent. *Moreland v. Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 2025 IL 131343, ¶ 27. The most reliable indicator of legislative intent is the statutory language, given its plain and ordinary meaning. *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 56. The construction of a statute is a question of law, which we review *de novo*. *Moreland*, 2025 IL 131343, ¶ 27.

¶ 108    By its express terms, section 506(a)(2) states that the GAL's report must be submitted not less than 30 days before trial "[u]nless the court directs otherwise." 750 ILCS 5/506(a)(2) (West 2024). The court directed otherwise here on December 5, 2024, when it entered an order providing that the GAL report must be submitted at least 30 days before trial *only* if either party requested such a report by January 1, 2025. Neither party requested a GAL report by January 1, 2025, and therefore pursuant to the December 5 order the parties effectively waived the 30-day requirement.

¶ 109    Jennifer argues that even if not untimely, the court still should not have admitted the Important Case Notes. Evidence is admissible when it is relevant to an issue. Illinois Rules of Evidence 402 (eff. Jan. 1, 2011). Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable

or less probable than it would be without the evidence." Illinois Rules of Evidence 401 (eff. Jan. 1, 2011). Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Illinois Rules of Evidence 403 (eff. Jan. 1, 2011). The admission of evidence rests within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *Pyskaty v. Oyama*, 266 Ill. App. 3d 801, 808 (1994).

¶ 110  The Important Case Notes were relevant and admissible where they reflected the GAL's findings and recommendations as to who should be given decision-making authority about the children's educational and medical care. See 750 ILCS 5/506(a)(2) (West 2024) (providing that the GAL's written recommendations are relevant and admissible without the need for foundation). The probative value of the Important Case Notes was not substantially outweighed by its prejudicial effect. Jennifer was not prejudiced by the admission of the Important Case Notes at trial because its conclusion that Eric should be given sole decision-making on the children's medical and educational issues was the same conclusion as that contained in the GAL's written recommendations of May 16, 2025. After receiving those written recommendations, the court had continued the trial and given Jennifer additional discovery on the GAL's recommendations and a deposition of the GAL. Thus, prior to trial, Jennifer was given ample opportunity to discover and explore the basis for the GAL's recommendations contained in his Important Case Notes, and Jennifer was given the opportunity to cross-examine him at trial. On this record, the court committed no abuse of discretion in admitting the Important Case Notes into evidence.

¶ 111  Jennifer argues, though, that the Important Case Notes should not have been admitted because they were "incomplete" in violation of Illinois Supreme Court Rule 907(c) (eff. Mar. 8, 2016). Rule 907(c) states that the GAL shall "take whatever reasonable steps are necessary to

obtain all information pertaining to issues affecting the child, including interviewing family members and others possessing special knowledge of the child's circumstances." *Id.*

¶ 112   The GAL's Important Case Notes reveal that he contacted the following persons: Eric; Jennifer; B.P.; E.P.; Christina Peters, E. P.'s therapist; Dr. Jonathan Bloomberg, E.P.'s former psychiatrist; Jean O'Mahoney, Jennifer's therapist; Dr. Cho, E.P.'s psychiatrist; Megan Clancey, the clinical director of psychology at the Cove School; Regina Aniolowski, the Principal at the Cove School; Sarah Garvey, E.P.'s speech therapist; Heather Heckman, B.P.'s therapist; Karen Carney, the Head of School at the Chicago Friends School; and Matt Cohen and Jill Calian, Jennifer's attorneys seeking to obtain education funding from District 65 for the Cove School.

¶ 113   Jennifer contends that the GAL also should have spoken with Stacy Frank (E.P.'s classroom teacher), Jamie Edelstein, and Lauren Crane (a Cove School social worker), but she never indicates the information they would have given or exactly why they should have been interviewed. Jennifer never even identifies who Edelstein is or the type of relationship she has with E.P. which would make her necessary to be interviewed. Jennifer also contends that the GAL should have spoken with Kathleen Zintsmaster, E.P.'s occupational therapist, but the GAL stated that he tried to contact her and she refused to speak with him. On this record, Jennifer has not shown that the GAL's failure to interview Frank, Edelstein, Crane, and Zintsmaster rendered his Important Case Notes incomplete under Rule 907(c).

¶ 114   Finally, Jennifer argues that the GAL should have spoken with Margot Touris, E.P.'s neuropsychologist, but the GAL stated she refused to speak with him because Jennifer had not paid her in full. Jennifer argues that she subsequently sent the GAL an e-mail informing him that Touris would now speak with him, but that he never contacted her. Again, though, Jennifer does not indicate the information that Touris would have given which would have been relevant to the

GAL's determination regarding parental decision-making authority for the children. Touris's neuropsychological evaluation report on E.P., which was admitted into evidence and is contained in the record on appeal, relates to E.P.'s educational needs but does not provide insight into which parent or parents should be given decision-making authority for the children. Similarly, Touris's written observation of E.P. was also admitted and it, too, relates to his educational needs and not to the decision-making abilities of the parents. In the absence of any indication in the record that Touris would have provided any information relevant to the GAL's recommendation as to which parent should be given decision-making authority for the children's educational and medical needs, we cannot say that the GAL violated Rule 907(c) by failing to interview her.

¶ 115    Next, Jennifer argues that the court erred by not striking the GAL's testimony where he "did not contact anyone until the eve of the May 2025 trial" and changed his recommendation on the eve of trial to advocate for Eric as the sole decision-maker for the children's educational and medical needs, thereby substantially prejudicing her and outweighing any probative effect of his testimony. As already discussed, though, the trial court here continued the trial to give Jennifer the opportunity to conduct further discovery and depose the GAL with respect to the change in his recommendation. As Jennifer was given the opportunity to discover and explore the basis of the GAL's updated recommendation, his testimony at trial with respect to that recommendation did not come as a surprise to Jennifer and did not substantially prejudice her so as to outweigh the probative value of the testimony.

¶ 116    Jennifer argues that the GAL's testimony should have been stricken due to his failure to speak with Touris. As discussed earlier in this order, the GAL spoke with many individuals, including both parents and the children, as well as E.P.'s former therapist and psychiatrist, his current psychiatrist, his speech therapist, and the director of psychology at the Cove School. He

tried to speak with Touris, but she refused him because Jennifer had not paid her in full. The court specifically found that "the GAL took the reasonable steps necessary to investigate the issues affecting the minor children in this case. He conducted a thorough investigation, provided recommendations to the parties, and credibly testified to the bases of those recommendations. The Court will consider Mr. Sternfield's testimony and recommendations in its determination of the best interests of the children." On this record, we cannot say that the trial court abused its discretion in admitting and considering the GAL's testimony, where he interviewed family members and others possessing special knowledge of E.P.'s circumstances and took reasonable steps to obtain all information pertaining to issues affecting E.P., in accordance with Rule 907(c).

¶ 117   For all the foregoing reasons, we affirm the circuit court.

¶ 118   Affirmed.